# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: METROPOLITAN LIFE INSURANCE COMPANY SALES PRACTICES LITIGATION | ) MISC. DOCKET NO. 96-179 ) MDL NO. 1091 ) |
| THIS DOCUMENT RELATES TO: | ) JUDGE AMBROSE ) MAGISTRATE JUDGE BENSON ) |
| Amodeo     C.A. No. 96-0795 Biggs     C.A. No. 96-0038 Caskey     C.A. No. 95-1426 Garrett     C.A. No. 96-0436 Oddi     C.A. No. 96-0051 | ) ) ) ) ) |

**STIPULATION OF SETTLEMENT**

TABLE OF CONTENTS

PAGE

I.   Introduction ................................................................ 1

II.  Definitions ................................................................ 6

III. Settlement Relief .......................................................... 22

IV.  General Relief ............................................................. 24

    A. Settlement Death Benefit ............................................... 24
    B. Accidental Death Benefit ............................................... 27
    C. Increase to the General Relief ......................................... 28
    D. Research Initiative Regarding Terminated Policies and Annuities ......... 29

V.   DAC Tax Relief ............................................................. 30

VI.  Claim Evaluation ........................................................... 32

    A. Structure .............................................................. 32
    B. Procedures ............................................................. 32
        1. Claim Submission .................................................. 32
        2. The Company's Gathering of Certain Information .................... 34
    C. Claim Evaluation ....................................................... 35

VII. The Claim Review Process ................................................... 35

    A. Review of the Claim .................................................... 35
    B. Distribution of Relief Awarded in the Claim Review Process .............. 36
    C. Payment of the Claim Evaluator's Fees and Expenses ..................... 38

VIII. The Part VIII ADR Process ................................................. 39

IX.  The Part IX Arbitration Process ............................................ 40

X.   The Company's Funding Obligations .......................................... 41

    A. Establishing the CRP Cash/Credit Relief Fund ........................... 41
    B. Funding the Relief under Sections IV - VII of this Agreement ............ 41
    C. Funding Reverts upon Termination ....................................... 42

XI.    Notice To The Class and Communications With Class Members . . . . . . . . . . . . . . . . . . . 42

       A.  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
       B.  Class Notice Package . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            1.  Class Notice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
                 a.  General Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
                 b.  Notice of Exclusion and Objection Rights  . . . . . . . . . . . . . . . . . . . . 43
                 c.  Notice of Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
            2.  Release  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            3.  Fact Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            4.  Frequently Asked Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            5.  Statement of Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            6.  Benefit Voucher  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            7.  Election Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
            8.  Designation Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
            9.  Remailing and Additional Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
       C.  Publication Notice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       D.  Post-Settlement Mailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       E.  Retention of Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
       F.  Toll-Free Telephone Number for Settlement Information  . . . . . . . . . . . . . . . . . . . 49
       G.  Right of Communication with Claimants and Company Customers . . . . . . . . . . . . 52
       H.  Media Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
       I.  The Company's Dealings with Producers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       J.  Co-Lead Counsel's Communications with Producers . . . . . . . . . . . . . . . . . . . . . . 54
       K.  Co-Lead Counsel's Administrative Responsibilities  . . . . . . . . . . . . . . . . . . . . . . 55

XII.   Requests for Exclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XIII.  Objections to Settlement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

XIV.   Release and Waiver and Order of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

       A.  Release and Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
       B.  Order of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

XV.    Attorney's Fees and Expenses and Incentive Awards  . . . . . . . . . . . . . . . . . . . . . . . . . 68

XVI.   Order Of Notice, Settlement Hearing and Administration  . . . . . . . . . . . . . . . . . . . . . . 70

XVII.  Final Approval and Final Order and Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XVIII. Modification or Termination of this Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XIX.   General Matters And Reservations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## STIPULATION OF SETTLEMENT

IT IS HEREBY STIPULATED AND AGREED, by, between and among Charles V. Amodeo, Dennis W. Biggs, Sr., Joseph P. Garrett, Jr., Ronald R. Hess, Arthur E. Leach, Richard L. Oddi, Harvey J. Williams, and Michael A. Rankin, in their individual and representative capacities  ("Plaintiffs"), and Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, and Metropolitan Tower Life Insurance Company (hereinafter collectively referred to as "MetLife," the "Company" or "Defendants") through their duly authorized counsel, that the consolidated class action lawsuit comprised of the following cases:  Amodeo v. Metropolitan Life Insurance Company, C.A. No. 96-0795; Biggs v. Metropolitan Life Insurance Company, C.A. No. 96-0038; Caskey, et al.  v. Metropolitan Life Insurance Company, et al.; C.A. No. 95-1426; Garrett v. Metropolitan Life Insurance Company, C.A. No. 96-0436; and Oddi v. Metropolitan Life Insurance Company, C.A. No. 96-0051, which are pending as part of the multi-district litigation captioned In re:  Metropolitan Life Insurance Company Sales Practices Litigation, Misc. Docket No. 96-179, MDL No. 1091 (W.D. Pa.) (the "Action"), and the matters raised by the Action, are settled, compromised and dismissed on the merits and with prejudice, on the terms and conditions set forth in this Stipulation of Settlement (the "Settlement Agreement" or "Agreement") and the Release set forth herein, subject to the approval of the Court.

## I.    **INTRODUCTION**

A.    This litigation involves numerous actions that were consolidated for pretrial purposes.  Several of the cases were initially filed in the United States District Court for the Western District of Pennsylvania, and several others were transferred to that court by the Judicial

Panel on Multidistrict Litigation.  The complaints in all of the cases allege improper sales practices in the sale of MetLife permanent life insurance policies or annuities.  MetLife vigorously disputes these allegations.

      B.     At least seven of the plaintiffs in the multi-district litigation – Charles V. Amodeo, Dennis W. Biggs, Sr., Juanita I. Caskey, Kristel M. Davis, Joseph P. Garrett, Jr., Richard L. Oddi, and Harvey J. Williams – styled their actions as class actions.  On July 1, 1996, these plaintiffs filed a Consolidated Class Action Complaint, in which they were all named as proposed class representatives.

      C.     Arthur E. Leach moved to intervene as a representative plaintiff and to file an amended complaint in the Action on October 26, 1998.

      D.     Ronald R. Hess moved to intervene as a representative plaintiff and to file an amended complaint in the Action on December 23, 1998.

      E.     The plaintiffs in the consolidated class action moved to amend the Complaint on August 16, 1999, and attached to their motion a proposed Amended Complaint (the "Amended Complaint").  In conjunction with that motion, Plaintiff Michael A. Rankin sought to intervene as a representative plaintiff.  The Complaint and the Amended Complaint assert claims relating to the Company's sales practices and the sale and characteristics of the Company's products.  The Company denies all of the material allegations of the Complaint and the Amended Complaint.

      F.     The Company filed a motion to dismiss the Action on September 30, 1996.  After voluminous briefing by Plaintiffs and the Company, Magistrate Judge Kenneth J. Benson filed a Report and Recommendation on June 20, 1997, which recommended granting the motion in part

and denying it in part. The Court adopted the Report and Recommendation and issued an Order on August 12, 1997, in which:

      1.     The Court dismissed the claims asserted by plaintiff Kristel M. Davis, holding that she lacked standing to sue because she was not the purchaser of the policy in question;

      2.     The Court dismissed the first claim asserted by plaintiff Juanita I. Caskey based on the statute of limitations;

      3.     The Court dismissed the claims for mutual mistake and unilateral mistake based on the policyholders' answers to question 12(c) of the application for insurance, but let stand the unilateral mistake claims of the "vanishing premium" plaintiffs, Biggs and Williams, who alleged a unilateral mistake of facts based upon policy illustrations;

      4.     The Court dismissed the claim for breach of the implied duty of good faith and fair dealing, holding that an alleged failure to disclose information prior to entering into a contract cannot breach a duty that arises from the contract;

      5.     The Court dismissed the claims for relief under the New York and Delaware consumer fraud statutes, holding that the text of those statutes limits their application to residents of the respective states;

      6.     The Court dismissed the claim for relief under the New York Insurance Law, holding that the statute does not apply to transactions outside the State of New York and does not create a private right of action for violation of the statute;

7.    The Court denied the Company's motion to dismiss the claims of

Plaintiffs Charles V. Amodeo, Dennis W. Biggs, Sr., Joseph P. Garrett, Jr., Richard L. Oddi and

Harvey J. Williams, which was based on various statute of limitations arguments; and

8.    The Court denied the Company's motion to dismiss the Plaintiffs' fraud,

negligent misrepresentation, negligence, breach of contract, breach of fiduciary duty, unjust

enrichment and constructive trust claims.

G.    After taking depositions of the named Plaintiffs, the Company filed motions for

summary judgment as to Charles V. Amodeo, Juanita I. Caskey, Richard L. Oddi, and Dennis W.

Biggs, Sr., on July 25, 1997.

H.    After extensive briefing, Magistrate Judge Benson issued Reports and Recom-

mendations in which he recommended that the Company's motions for summary judgment be

granted in part and denied in part. The Court adopted the Reports and Recommendations, and

issued Orders:

1.    On May 12, 1998, granting summary judgment in favor of the Company

on plaintiff Caskey's claims based on her election of remedies;

2.    On June 17, 1998, granting summary judgment in favor of the Company

on Plaintiff Oddi's breach of fiduciary duty and unjust enrichment claims, granting partial

summary judgment in favor of the Company on his misrepresentation claims (only to the extent

the claims were premised on allegations that Plaintiff Oddi was not informed of the fees to be

charged in the transaction), and denying the Company's motion based on Plaintiff Oddi's alleged

failure to establish any damages and on statute of limitations grounds;

4

3.      On June 17, 1998, denying the Company's motion for summary judgment on Plaintiff Amodeo's claims concerning the imposition of cost of insurance charges and the Deferred Acquisition Cost ("DAC") tax; and

4.      On June 17, 1998, denying the Company's motion for summary judgment as to Plaintiff Biggs, which motion was based on arguments regarding ripeness, the lack of any present damage, the statute of limitations, and the policy language.

I.      Before commencing this Action and throughout the pendency of the Action, and during settlement negotiations, Plaintiffs' counsel and their professional consultants conducted a thorough examination and evaluation of the relevant law and facts to assess the merits of their claims and potential claims and to determine how best to serve the interests of Plaintiffs and the Class, as defined below.  In the course of their examination, Plaintiffs' counsel reviewed approximately 4,000,000 pages of documents produced by the Company, deposed four Company officers, and conducted other informal discovery of the Company.  In addition, Plaintiffs' counsel retained and consulted with experts concerning the discovery conducted in this matter, the merits of Plaintiffs' claims, and the defenses raised by Defendants.

J.      Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiffs and Co-Lead Counsel for Plaintiffs have agreed to settle the Action pursuant to the provisions of this Agreement after considering, among other things: (*i*) the substantial benefits available to Plaintiffs and the Class under the terms of this Agreement; (*ii*) the attendant risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and

(*iii*) the desirability of consummating this Agreement promptly to provide effective relief to Plaintiffs and the Class.

K.     The proposed settlement has been reviewed by various consultants and experts retained by Plaintiffs, and Plaintiffs and their counsel have agreed that this Agreement is fair, reasonable and adequate because it provides substantial benefits to the Class, is in the best interests of the Class, and fairly resolves the claims alleged.

L.     The Company, while expressly denying any wrongdoing alleged in the Action and not admitting or conceding any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it in the Action, and without conceding any infirmity in the defenses it has asserted or that any damages are recoverable or the amount of any damages that may have been incurred, considers it desirable for the Action to be settled and dismissed because this settlement will (i) provide significant benefits to the Company's present and former policy and annuity owners, and (ii) avoid the substantial expense, burdens and uncertainties associated with continued litigation of those claims.

## II.     DEFINITIONS

As used in this Agreement and the annexed exhibits (which are an integral part of this Agreement and are incorporated in their entirety by reference), the following terms have the following meanings, unless a section or subsection of this Agreement or its exhibits provides otherwise:

1.     "Accidental Death Benefit" or "ADB" means the form of General Relief to be provided to Class Members who have or had an ownership interest in an Annuity or Annuities

6

issued by the Company and who do not elect Claim Evaluation, as described below in section VI.B.

2.    "Action" means the consolidated class action lawsuit comprised of the following cases: Amodeo v. Metropolitan Life Insurance Company, C.A. No. 96-0795; Biggs v. Metropolitan Life Insurance Company, C.A. No. 96-0038; Caskey, et al. v. Metropolitan Life Insurance Company, et al., C.A. No. 95-1426; Garrett v. Metropolitan Life Insurance Company, C.A. No. 96-0436; and Oddi v. Metropolitan Life Insurance Company, C.A. No. 96-0051, which are pending as part of the multi-district litigation captioned In re: Metropolitan Life Insurance Company Sales Practices Litigation, Misc. Docket No. 96-179, MDL No. 1091 (W.D. Pa.).

3.    "Administrator" means any third-party administrator whom the Company shall retain to help implement the terms of this Agreement, upon consultation with Co-Lead Counsel. Defendants and Co-Lead Counsel specifically acknowledge that the Company may, but is not required to, retain Rust Consulting, Inc. of Minneapolis, Minnesota, as the Administrator under this Agreement.

4.    "Affinity Group" means (i) the Class Member or his or her spouse, parent or child (including a stepchild residing with the Class Member), and/or (ii) any person in whom the Class Member has an insurable interest.

5.    "Aggregate CRP Relief" means the aggregate relief to be awarded in the Claim Review Process as described in section VII.B below and in the attached Exhibit A, which amount does not include relief granted in the Part VIII ADR Process or the Part IX Arbitration Process described herein.

7

6.      "Agreement" or "Settlement Agreement" means this Stipulation of Settlement and the attached exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

7.      "Alternate Measuring Life" means, for purposes of any death benefit provided for in this settlement, a person who is a member of the Class Member's Affinity Group and is not the insured under the Policy or the annuitant under the Annuity making the Class Member eligible for relief.

8.      "Alternate Payee" means such person as the Class Member may choose to receive the death benefit pursuant to the terms and conditions set forth below.

9.      "Amended Complaint" means the proposed Amended Consolidated Class Action Complaint in this Action filed by Plaintiffs on August 16, 1999.

10.     "Annuity" or "Annuities" means a deferred annuity contract or certificate with an Issue Date within the Class Period that the Company issued in the United States pursuant to an individual sale.

11.     "Annuity Account Value" means the account value measured (i) as of May 25, 1999 for all In Force single premium Annuities; (ii) as of June 9, 1999 for all In Force flexible premium Annuities; and (iii) as of the date of termination for Terminated Annuities; provided, however, that for Terminated single premium Annuities the term means the original deposit amount without interest, unless the Terminated single premium Annuity was issued by the Company after it acquired the business from another company, in which case the term means the account value at the time the Company acquired the business.

8

12.    "Attorneys' Fees and Expenses" means such funds as may be awarded to Co-Lead Counsel to compensate them (and all other attorneys for Plaintiffs or Class Members in this Action) for their fees and expenses in connection with the Action.

13.    "Benefit Voucher" means the voucher to be included in the Class Notice Package, substantially in the form contained in Exhibit B, entitling the Class Member to payment of a death benefit upon the Company's receipt of due proof of the qualifying death of the Measuring Life within the benefit period, as provided in this Agreement.

14.    "Claim" means a claim by a Class Member or his or her representative timely submitted to Claim Evaluation.

15.    "Claim Categorization" means the assignment of a Claim to one or more Claim categories, as defined in Exhibit A to this Agreement.

16.    "Claim Designation" means the scoring of a Claim by the Claim Evaluator pursuant to Exhibit A hereto.

17.    "Claim Evaluation" means the procedures described in sections VI - IX to this Agreement and in Exhibit A hereto for the presentation, evaluation and resolution of Claims in the Claim Review Process, the Part VIII ADR Process and the Part IX Arbitration Process.

18.    "Claim Evaluator" means a person chosen by Co-Lead Counsel who is responsible for CRP Administration, Claim Categorization, Claim Designation, and, where appropriate, awarding relief for Claims pursuant to the terms of this Agreement.

a.    The Claim Evaluator may retain as many assistants as are reasonably necessary to process Claims in an efficient and timely manner.

9

b.      The Company may request that Co-Lead Counsel remove the

Claim Evaluator for financial defalcation or gross misconduct.  Such request shall not be

unreasonably denied.  Co-Lead Counsel may also remove the Claim Evaluator for any reason at

any time.  If the Claim Evaluator is removed, Co-Lead Counsel shall choose another Claim

Evaluator.

19.      "Claim File" means the file assembled for each Claim for use in Claim

Evaluation.  The Claim File shall include (1) the Claim Form and all other materials submitted

by the Claimant, (2) the Customer File, (3) any other information provided to the Claim

Evaluator, and (4) any other information agreed to by the Parties.

20.      "Claim Form" means the form for Claimants to submit their Claim to

Claim Evaluation, which shall be substantially in the form contained in Exhibit I.  Each Claim

Form shall include a signed Claimant Declaration.

21.      "Claimant" means a Class Member, or the legal or authorized representa-

tive of a Class Member, who submits a Claim to Claim Evaluation.

22.      "Claimant Declaration" means the declaration, signed by each Claimant,

that appears at the conclusion of the Claim Form.  Each declaration shall state: "I declare under

penalty of perjury that (1) the foregoing is true and correct, (2) I submit herewith copies of all

documents in my possession relating to the policy or annuity that is the subject of my claim, and

(3) all such copies (if any) are authentic and unaltered copies of the original documents."

23.      "Claimant Representative" means the person appointed by Co-Lead

Counsel for Plaintiffs to counsel and represent a Claimant in the Part IX Arbitration Process.

10

24.     "Claim Review Process" or "CRP" means the process for the presentation, evaluation and resolution of certain categories of Claims submitted to Claim Evaluation, as more particularly described in section VII of this Agreement and Exhibit A hereto.

25.     "Class" or "Class Member" means all persons or entities who have or had an ownership interest in any Permanent Life Insurance Policy or any deferred annuity contract or certificate issued by the Company in the United States during the Class Period pursuant to an individual sale, but does not include (i) any present or former employee, director or sales representative of the Company, or his or her spouse; or (ii) any insurance company that owns or owned a Policy or Annuity pursuant to an absolute assignment effected as part of an exchange under section 1035 of the Internal Revenue Code.  Notwithstanding the foregoing, the Class shall not include (unless and to the extent such persons or entities are Class Members by virtue of their ownership interest in another Policy or Annuity) the following:  (i) any persons or entities who make a timely election to be excluded from the proposed class with respect to a particular Policy (or Policies) or Annuity (or Annuities); and (ii) any persons or entities who have or had an ownership interest in a Policy or Annuity that (a) was terminated due to the death of the insured or the annuity owner or annuitant; (b) was issued by the Company, but not accepted or paid for, or was returned to the Company as part of the exercise of a free look provision in the Policy or Annuity; (c) was rescinded as part of a reissue of a new Policy or Annuity, or because of a material misrepresentation on a Policy or Annuity application, or where the Policy or Annuity was rescinded and the premiums or other monies paid were returned to the Policy or Annuity owner with interest and the owner was represented by counsel at the time; (d) resulted in the award of relief pursuant to the nationwide class action settlement of savings and retirement plan

11

claims in <u>Horton v. Metropolitan Life Ins. Co.</u>, Civ. No. 93-1849-CIV-T-23A (M.D. Fla.); (e) is

the subject of a release signed by any person or entity while represented by counsel settling a

claim or dispute and releasing MetLife from any further liability concerning such Policy or

Annuity; (f) was issued in connection with the Transamerica HomeFirst Reverse Mortgage

Program; or (g) makes such person or entity a member of the class certified by order of the

United States District Court for the Southern District of New York dated August 24, 1998 in

<u>Dornberger v. Metropolitan Life Ins. Co.</u>, No. 95-CIV-10374 (LBS) (S.D.N.Y.).

26.   "Class Notice" means the legal notice of the terms of the proposed

settlement included in the Class Notice Package.

27.   "Class Notice Package" means the notice package, as approved in form

and content by counsel to Plaintiffs and Defendants and the Court, and substantially in the form

attached hereto as Exhibit B, to be provided to Class Members pursuant to subsection XI.B of

this Agreement. The Class Notice Package shall include (a) a cover letter from the Company;

(b) the Class Notice; (c) one or more Election Forms (depending on the number of Policies or

Annuities); (d) one or more Designation Forms (depending on the number of Policies or

Annuities); (e) one or more Statements of Eligibility (depending on the number of Policies or

Annuities); (f) a list of frequently asked questions with page references to the Class Notice; (g) a

Fact Sheet describing the General Relief, Claim Evaluation and DAC Tax Relief; and (h) a

Benefit Voucher evidencing the relief to which the Class Member is entitled if the Class Member

does not elect Claim Evaluation.

28.   "Class Period" means the period from January 1, 1982 through December

31, 1997, inclusive.

12

29.     "Co-Lead Counsel" or "Co-Lead Counsel for Plaintiffs" means the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Specter Specter Evans & Manogue, P.C.

30.     "Company" means Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, and Metropolitan Tower Life Insurance Company.

31.     "Company Liaison" means a person appointed by the Company to serve as a liaison between the Claim Evaluator and the Company, as more particularly described in section VI.B.2 below.

32.     "Complaint" means the Consolidated Class Action Complaint in this Action filed by Plaintiffs on July 1, 1996.

33.     "Court" means the United States District Court for the Western District of Pennsylvania, where the Action is pending.

34.     "CRP Administration" means, with respect to each Claim subject to the Claim Review Process, those administrative tasks to be completed after the Company delivers the relevant Claim File to the Claim Evaluator, and includes, without limitation, the categorization, designation, and awarding of relief for that Claim.

35.     "CRP Cash/Credit Relief Fund" means that portion of the CRP Total Fund that is comprised of a $300 million fund established by the Company to make Policy or Annuity adjustments or, in certain circumstances, cash payments, as part of the Claim Review Process.

36.     "CRP Death Benefit Relief Fund" means that portion of the CRP Total Fund that is comprised of a fund established by the Company to provide death benefits to participants in the Claim Review Process.

13

37.     "CRP Total Fund" means the total monies available to compensate

Claimants in the Claim Review Process. It is comprised of the CRP Cash/Credit Relief Fund and

the CRP Death Benefit Fund.

38.     "Customer File" means a file of information that shall include: (a) the

Policy or Annuity owner's name, current address and social security number or tax identification

number; (b) the Policy or Annuity number; (c) the Policy or Annuity plan code; (d) the Policy

Face Amount as of the Issue Date; (e) the Policy's or Annuity's Issue Date; (f) the issue age and

gender of the insured or annuitant; (g) the Policy's or Annuity's termination date, if applicable;

(h) the Policy's or Annuity's surrender charge, if any; (i) the contract or planned premium; (j) the

payment, loan and dividend history and current values of the Policy or Annuity as of the date the

Company is assembling each particular customer file, where applicable, or where such informa-

tion is not available in the Company's databases, the cost/basis information for the Policy or

Annuity; (k) the dividend option selected for the Policy, where applicable; (l) the information

about Policy transactions maintained on the Company's Consolidated Warrant System (Internal

Funds Transfer) computerized database, to the extent it is accessible as of the date the Company

is assembling each particular customer file; (m) to the extent available, the Policy or Annuity

application file (excluding any medical underwriting); and (n) any complaints relating to the

Policy or Annuity, the response of the Company thereto, and correspondence relating to the

substance of any complaints and their resolution, to the extent such materials are electronically

maintained by the Company at its Home Office and/or can be identified through the MetLife

Office of Corporate Customer Relations.

14

39.     "DAC Tax" means payments due under section 848 of the Internal
Revenue Code, which was enacted in 1990 and requires a life insurance company to amortize
"specified policy acquisition expenses" on a straight-line basis over 120 months for federal
income tax purposes.

40.     "DAC Tax Relief" means death benefit coverage provided to Class
Members with qualifying Policies pursuant to section V of this Agreement.

41.     "Default Measuring Life" means, with respect to any of the death benefits
provided in this Agreement, the insured under the Policy or the annuitant under the Annuity
making the Class Member eligible for relief.

42.     "Default Payee(s)" means, with respect to any of the death benefits
provided in this settlement, the Class Member(s).

43.     "Defendants" means Metropolitan Life Insurance Company, Metropolitan
Insurance and Annuity Company, and Metropolitan Tower Life Insurance Company.

44.     "Defendants' Counsel" means the law firms of Skadden, Arps, Slate,
Meagher & Flom LLP, and McCarter & English, LLP.

45.     "Designation Form" means the document substantially in the form
attached hereto as part of Exhibit B, one or more copies of which form (a) shall be included in
the Class Notice Package and (b) may be used by Class Members to designate an Alternate Payee
and/or an Alternate Measuring Life, pursuant to this Agreement.

46.     "Election Form" means a document substantially in the form attached
hereto as part of Exhibit B, one or more copies of which will be included in the Class Notice

15

Package and may be used by Class Members in electing Claim Evaluation pursuant to section VI of this Agreement.

47.    "Eligibility Date" means a date specified by the Company that is not more than 45 days before the date on which the Class Notice Package is first mailed to Class Members.

48.    "Execution Date" means the first date on which the Agreement has been executed by all of the undersigned.

49.    "Fact Sheet" means the document substantially in the form attached hereto as part of Exhibit B, which shall be enclosed as part of the Class Notice Package and provide more specific details about the General Relief, Claim Evaluation and DAC Tax Relief.

50.    "Fairness Hearing" means the hearing at or after which the Court will make a final decision whether to approve this Agreement as fair, reasonable and adequate.

51.    "Final Order and Judgment" means the Order finally certifying the Class for settlement purposes only and approving the settlement and this Agreement, and the judgment entered pursuant to that Order, as contemplated in section XVII of this Agreement and substantially in the form attached hereto as Exhibit G.

52.    "Final Settlement Date" means the date on which the Final Order and Judgment approving this Agreement becomes final.  For purposes of this definition, the Final Order and Judgment shall become final: (a) if no appeal is taken therefrom, on the date on which the time to appeal therefrom has expired; (b) if any appeal is taken therefrom, on the date on which all appeals therefrom, including petitions for rehearing or reargument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of in a manner resulting in an affirmance of the Final Order and Judgment; or (c) on a

16

date after entry of the Final Order and Judgment, which date counsel for the Parties agree to in writing.

53. "General Relief" means the Settlement Death Benefit for eligible Policy owners, and the Accidental Death Benefit for eligible Annuity owners, as more particularly described in section IV of this Agreement.

54. "Hearing Order" means the order to be entered by the Court concerning notice, administration and the Fairness Hearing, as contemplated in section XVI of this Agreement, and substantially in the form attached hereto as Exhibit E hereto.

55. "Home Office" means the headquarters of the Company at One Madison Avenue, New York, New York 10010 and its administrative offices that provide administrative support functions for the operations of the Company.

56. "Implementation Date" means (a) for purposes of General Relief and DAC Tax Relief, a date selected by the Company, and communicated in writing to Co-Lead Counsel, that is no more than 30 days after the Final Settlement Date; and (b) for purposes of Claim Evaluation, the date the Company first commences the Post-Settlement Mailing. The Company shall use its best efforts to begin mailing the Post-Settlement Mailing no later than 30 days after the Final Settlement Date.

57. "In Force" means, for purposes of this Agreement only, that a Policy or Annuity has not lapsed, been surrendered, or otherwise terminated, and has not ceased to provide coverage due to the death of the insured or the annuitant. The term "In Force," for purposes of this Agreement only, does not include a Policy providing coverage under a reduced paid-up insurance non-forfeiture option or an extended term non-forfeiture option.

17

58.    "Investment Plan" means a pension or retirement plan, investment or savings account, tuition-funding or mortgage-protection plan, or any other type of investment, savings or thrift vehicle.

59.    "Issue Date" means the "issue date" set forth on the Policy or Annuity contract or certificate.

60.    "Measuring Date" means the date that is the earlier of (i) 15 days follow-ing the date upon which the Policy or Annuity was delivered to the Policy owner or Annuity owner, or (ii) 45 days following the Issue Date.

61.    "Measuring Life" means the person upon whose qualifying death the death benefits provided for in this Agreement will be paid, which person shall be the Default Measur-ing Life, unless the Class Member designates an Alternate Measuring Life.

62.    "Misrepresentation" means either an untrue statement of material fact made to the Class Member (or his or her representative) or an omission of material fact necessary in order to make the statements made to the Class Member (or his or her representative), in light of the circumstances under which they were made, not materially misleading.

63.    "Parties" or "Party" means Plaintiffs (in their individual and representative capacities) and/or Defendants collectively and, where applicable, their respective counsel.

64.    "Part VIII ADR Process" means the alternative dispute resolution process described in section VIII of this Agreement and Part VIII of Exhibit A.

65.    "Part IX Arbitration Process" means the arbitration process described in section IX of this Agreement and Part IX of Exhibit A.

18

66.    "Payee" means the person to whom the applicable death benefit under this Agreement shall be paid. This person shall be the Default Payee, unless the Class Member designates an Alternate Payee; provided, however, that if the Default Payee and the Alternate Payee are deceased, the Company may pay the applicable death benefit to any person named as the beneficiary of the Policy or Annuity, or if that person is deceased or cannot be paid for any reason, to any relative of the Class Member or Measuring Life by blood or marriage appearing to the Company to be equitably entitled to such payment.

67.    "Permanent Life Insurance Policy" means participating whole life insurance policies, universal life insurance policies and/or variable universal life insurance policies (including flexible premium and flexible premium multifunded life insurance policies), as well as any rider issued in conjunction therewith and/or endorsement attached thereto.

68.    "Plaintiffs" means Charles V. Amodeo, Dennis W. Biggs, Sr., Joseph P. Garrett, Jr., Ronald R. Hess, Arthur E. Leach, Richard L. Oddi, Harvey J. Williams, and Michael A. Rankin, and any other Class Members who may subsequently be added as named plaintiffs, in their individual and representative capacities.

69.    The term "Policy" or "Policies" means a Permanent Life Insurance Policy or Policies with an Issue Date within the Class Period that the Company issued in the United States pursuant to an individual sale.

70.    "Policy Face Amount" means, for traditional policies, the initial face amount of the base policy, excluding any riders sold at issue. For variable or non-variable universal life policies, this term means the specified face amount of the policy, excluding any riders sold at issue.

19

71.    "Post-Settlement Mailing" means the letter and Claim Form to be mailed to all Class Members who have timely elected Claim Evaluation.

72.    "Producer" means any of the Company's current or former producers, account representatives, sales representatives, sales agents, general agents, branch managers, brokers or solicitors, and any other person who engages or has engaged in the sale or distribution of the Company's products.

73.    "Publication Notice" means the published summary of the Class Notice, including notice of the proposed settlement, the Fairness Hearing and the Class Members' exclusion, objection and appeal rights, as approved in form and content by the Court, as described in section XI.C and substantially in the form as attached hereto as Exhibit C.

74.    "Release" means the release and waiver set forth in section XIV of this Agreement.

75.    "Released Transactions" means any and all claims arising out of, concerning, or in any way relating to the marketing, solicitation, application, underwriting, issuing, pricing, charges, rates, acceptance, sale, purchase, operation, retention, administration, servicing or performance of any Policy; and any and all claims arising out of, concerning, or in any way relating to the matters alleged in the Complaint and Amended Complaint.

76.    "Releasees" means the Company and each of its past, present and future parents (including intermediate and ultimate parents), subsidiaries, affiliates, predecessors, successors and assigns, and each of its past, present and future officers, directors, employees, general agents, agents, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and

20

assigns, or any of them, including any person or entity acting on behalf or at the direction of any of them.

77.    "Savings and Retirement Claim" means a Claim based on an alleged oral or written misrepresentation to a Policy applicant (i) that the product included or was primarily an Investment Plan, while it was not disclosed on or before the Measuring Date that the product was a life insurance policy, or the fact that the product was life insurance was disguised, deemphasized, or minimized; (ii) concerning the relative appropriateness of using life insurance solely to meet the applicant's savings and retirement goals; or (iii) in which the Policy's premiums were characterized as "deposits," "contributions," or "outlays," or the Policy's values were characterized as "savings," "capital," a "retirement account," a "money accumulation account" or a similar investment terminology and, given the total facts and circumstances surrounding the sale of the policy, such characterization was likely to mislead the Policy applicant.

78.    "Settlement Death Benefit" or "SDB" means a form of relief to be provided to certain Class Members who have or had an ownership interest in a Policy or Policies issued by the Company.

79.    "Simplified Underwriting" means the underwriting requirements set forth in Exhibit K hereto.

80.    "Statement of Eligibility" means a statement prepared by the Company and provided as part of the Class Notice Package that includes: (1) the Class Member's name and address as reflected in the Company's records; (2) the identification number of each Policy or Annuity making the Class Member eligible for relief; (3) the status of each Policy or Annuity as

21

of the Eligibility Date; (4) a statement of the form(s) of relief for which that specific Class

Member may be eligible; (5) the Default Payee and Default Measuring Life, if any, for purposes

of the applicable death benefit provided for in this Agreement; and (6) the identity of any co-

owner of record of each Policy or Annuity.  The Statement of Eligibility will be substantially in

the form included in Exhibit B.

      81.    "Terminated" means, for purposes of this Agreement only, that a Policy or

Annuity has lapsed, been surrendered or otherwise terminated, and has not been reinstated,

including any Policy providing coverage under an extended term non-forfeiture option or a

reduced paid-up insurance non-forfeiture option.

      82.    "Vanishing Premium" means (a) a concept under which an insurance·

policy's required premiums or charges may be paid out of its then-current and accumulated

values, as those premiums or charges become due, or (b) a concept under which a single out-of-

pocket premium payment or a fixed number of out-of-pocket premium payments – based on

then-current, nonguaranteed assumptions about dividend scales, interest rates, policy credits and

policy charges – may suffice to cover all required premiums or policy charges in excess of

dividends paid and/or policy credits credited and may keep coverage in force throughout the

insured's life, or for a specified period, without reducing the policy's face amount of insurance.

## III.    SETTLEMENT RELIEF

    A.    Pursuant to this Agreement, Class Members shall have an opportunity to receive

one of two alternative types of relief:  General Relief or Claim Evaluation.  With respect to each

Policy or Annuity making a Class Member eligible for relief, the Class Member may elect either

General Relief or Claim Evaluation, but not both.  In addition, Class Members who have or had

22

an ownership interest in certain Policies shall receive, in addition to any other relief, DAC Tax Relief, as described in section V below.

B.     Notwithstanding any other provision of this Agreement, where more than one person or entity has a current or prior ownership interest in a Policy or Annuity, all Class Members having such an interest in the Policy or Annuity shall be presumed to be acting jointly in exercising any right and receiving any benefit created under this Agreement (including all exhibits hereto) with respect to that Policy or Annuity, including the completion of the Election Form and the Claim Form; provided, however, that if any one such person or entity excludes himself or herself from the Class with respect to a Policy or Annuity, all such Class Members having a current or prior ownership interest in that Policy or Annuity will be deemed to be excluded with respect to that Policy or Annuity.  There shall be only one award of relief for each Policy or Annuity, regardless of the number of Class Members with current or prior ownership interests therein.

C.     If the Company determines that any particular form of relief provided under this Agreement could cause adverse consequences to the Class Member or to his or her Policy or Annuity, the Company may, in its sole discretion, provide the cash equivalent of any such relief.

D.     The Company and Co-Lead Counsel agree and warrant that they will act in good faith in overseeing and implementing this Settlement Agreement.  The Company agrees and warrants that it will not utilize any extraordinary or exceptional accounting or actuarial principles to recapture from Policy and Annuity owners the costs of, or deprive Class Members of, the benefits provided in this Settlement Agreement.  This provision shall not be construed to interfere with the Company's conduct of its business in the ordinary course.

23

## IV.   GENERAL RELIEF

All Class Members shall automatically be entitled to the General Relief for each Policy or Annuity they do not elect to submit to Claim Evaluation. The General Relief consists of two forms of relief, depending on whether the Class Member owns or owned a Policy or an Annuity: the Settlement Death Benefit and the Accidental Death Benefit. The anticipated value to Class Members of the Settlement Death Benefit is approximately $770 million, based on comparable insurance rates on the open market. The anticipated value of the Accidental Death Benefit is approximately $8 million, based on comparable insurance rates on the open market.

### A.   Settlement Death Benefit

1.   Class Members who own or owned a Policy making the Class Member eligible to participate in the Class and who do not submit a claim to Claim Evaluation shall automatically be entitled to the Settlement Death Benefit ("SDB"). The SDB shall commence on the Implementation Date.

2.   For each Policy making the Class Member eligible for relief, the SDB shall provide, for a period of up to 59 months, a payment to the Payee upon the Company's receipt of due proof of the death of the Measuring Life within the SDB period.

3.   At any time prior to the expiration of the SDB or the death of the Measuring Life, the Class Member may designate an Alternate Payee on the Designation Form to be provided as part of the Class Notice Package. If the Class Member does not designate an Alternate Payee, then the person to receive the SDB shall be the Default Payee.

24

4.      The amount and duration of the SDB that an eligible Class Member may receive for each eligible Policy will depend on (*i*) the age of the Measuring Life under the SDB as of the Implementation Date, (*ii*) the Policy Face Amount, (*iii*) the type of Policy, and (*iv*) whether and when the Policy Terminated, as set forth below:

a.      All Policies Except Flexible Premium Multifunded Life ("UL II") Either In Force or Terminated After January 1, 1994. For this category of Policies, the amount and duration of the SDB shall be calculated as the following percentage of the Policy Face Amount of the eligible Policy:

| SDB Measuring Life's Age | SDB Length | Percentage of Policy Face Amount |
|---|---|---|
| 30 or Younger | 59 months | 16.6% |
| 31-40 | 4 years | 16.6% |
| 41-50 | 3 years | 12.5% |
| 51-60 | 3 years | 8.3% |
| 61 or Older | 2 years | 8.3% |

b.      Flexible Premium Multifunded Life ("UL II") Policies Either In Force or Terminated After January 1, 1994. For this category of Policies, the amount and duration of the SDB shall be calculated as the following percentage of the Policy Face Amount of the eligible Policy:

| SDB Measuring Life's Age | SDB Length | Percentage of Policy Face Amount |
|---|---|---|
| 30 or Younger | 59 months | 10% |
| 31-40 | 4 years | 10% |
| 41-50 | 3 years | 7.5% |

25

| SDB Measuring Life's Age | SDB Length | Percentage of Policy Face Amount |
|---|---|---|
| 51-60 | 3 years | 5% |
| 61 or Older | 2 years | 5% |

c.    All Policies Except Flexible Premium Multifunded Life ("UL II")

Terminated On or Before January 1, 1994. For this category of Policies, the amount and duration of the SDB shall be calculated as the following percentage of the Policy Face Amount of the eligible Policy:

| SDB Measuring Life's Age | SDB Length | Percentage of Policy Face Amount |
|---|---|---|
| 30 or Younger | 3 years | 8.3% |
| 31-40 | 2 years | 8.3% |
| 41-50 | 2 years | 6.6% |
| 51-60 | 1 year | 6.6% |
| 61 or Older | 1 year | 4.2% |

d.    Flexible Premium Multifunded Life ("UL II") Policies Terminated

On or Before January 1, 1994. For this category of Policies, the amount and duration of the SDB shall be calculated as the following percentage of the Policy Face Amount of the eligible Policy:

| SDB Measuring Life's Age | SDB Length | Percentage of Policy Face Amount |
|---|---|---|
| 30 or Younger | 3 years | 5% |
| 31-40 | 2 years | 5% |
| 41-50 | 2 years | 4.2% |
| 51-60 | 1 year | 4.2% |
| 61 or Older | 1 year | 2.5% |

26

5.     If the Default Measuring Life is deceased as of the Implementation Date, then, prior to the Implementation Date (or within 30 days of the death of the Measuring Life, whichever is later), the Class Member or his or her estate must use the Designation Form to designate a member of the Class Member's Affinity Group as an Alternate Measuring Life for purposes of the SDB.  Simplified Underwriting will apply to the Alternate Measuring Life.  If the proposed Alternate Measuring Life satisfies the Simplified Underwriting requirements, Settlement Death Benefit coverage for the proposed Alternate Measuring Life shall begin upon satisfactory completion of the necessary underwriting.  If the proposed Alternate Measuring Life is uninsurable, then the Class Member or his or her estate must designate a different member of the Affinity Group as a proposed Alternate Measuring Life, who will be subject to Simplified Underwriting.

B.     Accidental Death Benefit

1.     Class Members who own or owned an Annuity making the Class Member eligible to participate in the Class and who do not submit a claim to Claim Evaluation shall automatically be entitled to the Accidental Death Benefit ("ADB").  The ADB shall commence on the Implementation Date.

2.     For each Annuity making the Class Member eligible for relief, the ADB shall provide, for a period of three years, a payment to the Payee in an amount described below upon the Company's receipt of due proof of the accidental death of the Measuring Life within the ADB period, pursuant to the terms of the Benefit Voucher.

3.     The amount of coverage under the ADB shall be based on the AnnuityAccount Value, as set forth below:

27

| Annuity Account Value | ADB Length | ADB Amount |
|---|---|---|
| Up to $10,000 | 3 years | $1,500 |
| $10,001 - $25,000 | 3 years | $2,250 |
| $25,001 - $50,000 | 3 years | $3,000 |
| $50,001 - $100,000 | 3 years | $4,000 |
| Over $100,000 | 3 years | $5,500 |

4.    If the Default Measuring Life is deceased as of the Implementation Date, then prior to the Implementation Date (or within 30 days of the death of the Measuring Life, whichever is later), the Class Member or his or her estate must use the Designation Form to designate a member of the Class Member's Affinity Group as an Alternate Measuring Life for purposes of the ADB.

5.    At any time prior to the expiration of the ADB, the Class Member may designate an Alternate Payee on the Designation Form to be provided as part of the Class Notice Package. If the Class Member does not designate an Alternate Payee, then the person to receive the ADB shall be the Default Payee.

C.    Increase to the General Relief

The SDB amounts and durations set forth in subsection IV.A.4 and the ADB amounts and durations set forth in subsection IV.B.3 have been calculated based on the assumptions that all Class Members would receive General Relief and that the Implementation Date would be March 31, 2000. After all claims in the Claim Review Process have been evaluated and scored by the Claim Evaluator, as provided in section VII below and Exhibit A hereto, the applicable SDB and

28

ADB amounts shall be increased to take into account the fact that fewer than all potential Class Members will receive General Relief.

For Policies, this recalculation shall be done by multiplying the amounts set forth in subsection IV.A.4 by the following factor:

$$\frac{\textit{Aggregate Policy Face Amounts as of the Eligibility Date}}{\textit{Aggregate Policy Face Amounts of Policies Actually Receiving the SDB}}$$

For Annuities, this recalculation shall be done by multiplying the amounts set forth in subsection IV.B.3 by the following factor:

$$\frac{\textit{Aggregate Annuity Account Values}}{\textit{Aggregate Annuity Account Values of Annuities Actually Receiving the ADB}}$$

The SDB and ADB amounts may be further increased pursuant to section II.D.11 of Exhibit A if the value of the Aggregate CRP Relief is less than the CRP Total Fund.

D.    Research Initiative Regarding Terminated Policies and Annuities

One year following the Implementation Date, and annually thereafter until any death benefits provided for in this Agreement are no longer in force, MetLife shall retain the services of a national information service bureau (such as TRW, Equifax, or COMSERV, Inc.), subject to the approval of Co-Lead Counsel for Plaintiffs, for the purpose of determining, based on the social security numbers of the Measuring Lives on all Terminated Policies and Annuities eligible to receive the death benefits provided for in this Agreement, whether any Measuring Life covered under any of these death benefits has died within the coverage period. If (*i*) the foregoing research reveals that any such person has died, and (*ii*) the Company, using its best efforts, is able to contact the Payee, and (*iii*) the Payee qualifies for payment of the death benefit, then the Payee shall be eligible to receive the applicable death benefit.

29

## V.    DAC TAX RELIEF

A.    Owners of certain Policies identified in Exhibit D shall automatically receive, in addition to any General Relief or relief awarded in Claim Evaluation, the DAC Tax Relief described in this section and in Exhibit D. The anticipated value to the Class of the DAC Tax Relief, which provides free death benefit coverage, is estimated to be $40.3 million, based on comparable insurance rates on the open market.

B.    In addition, as of a date no later than 30 days after the Implementation Date, the Company shall not include costs associated with the DAC Tax as part of a cost of insurance or other charge or expense on those Policies identified in Exhibit D if the costs associated with the DAC Tax are currently included as part of the cost of insurance charges for those Policies. The anticipated present value to the Class of this commitment is estimated to be approximately $136.9 million.

C.    For each Policy identified in Exhibit D making the Class Member eligible for relief, the DAC Tax Relief shall provide, for a period of up to 59 months, an additional payment to the Payee – over and above the Settlement Death Benefit or any relief awarded in Claim Evaluation – upon the Company's receipt of due proof of the death of the Measuring Life within the DAC Tax Relief coverage period. The estimated amount of each eligible Class Member's DAC Tax Benefit shall be reflected on the Benefit Voucher.

D.    The amount and duration of the DAC Tax Relief that an eligible Class Member may receive for each eligible Policy will depend on (*i*) the age of the Measuring Life as of the Implementation Date, (*ii*) the Policy Face Amount, and (*iii*) whether and when the Policy Terminated, as set forth in Exhibit D.

30

E.      If the Measuring Life is deceased as of the Implementation Date, then prior to the Implementation Date (or within 30 days of the death of the Measuring Life, whichever is later), the Class Member or his or her estate must use the Designation Form to designate a member of the Class Member's Affinity Group as an Alternate Measuring Life. This Affinity Group member shall be subject to Simplified Underwriting. If the proposed Alternate Measuring Life satisfies the Simplified Underwriting requirements, DAC Tax Relief coverage for the proposed Alternate Measuring Life shall begin upon satisfactory completion of the necessary underwriting. If the proposed Alternate Measuring Life is uninsurable, then the Class Member or his or her estate must designate a different member of the Affinity Group as a proposed Alternate Measuring Life, who will be subject to Simplified Underwriting.

F.      At any time prior to the expiration of the DAC Tax Relief or the death of the Measuring Life, the Class Member may designate an Alternate Payee on the Designation Form to be provided as part of the Class Notice Package. If the Class Member does not designate an Alternate Payee, the person to receive the payment of the DAC Tax Relief shall be the Default Payee.

G.      When a Class Member changes the Measuring Life or Payee with respect to the death benefit for a Policy, that change shall apply to all death benefits for which that Policy is eligible.

31

## VI.   CLAIM EVALUATION

### A.   Structure

Claim Evaluation shall be conducted in accordance with Exhibit A, which utilizes three separate procedures for evaluating claims:  the Claim Review Process, the Part VIII ADR Process, and the Part IX Arbitration Process.

### B.   Procedures

1.   Claim Submission.  Class Members who forego General Relief with respect to a particular Policy or Annuity may submit a Claim based on that Policy or Annuity to Claim Evaluation, except that Class Members shall not be entitled to submit a claim or receive relief in Claim Evaluation for Savings and Retirement Claims that were released in Horton v. Metropolitan Life Ins. Co., Civ. No. 93-1849-CIV-T-23A (M.D. Fla.).  Claims submitted to Claim Evaluation shall be evaluated in accordance with this section and the attached Exhibit A; relief for such Claims, if any, shall be awarded in accordance with Exhibit A.  Class Members who submit a Claim to Claim Evaluation with respect to a Policy or Annuity shall not be entitled to any form of General Relief with respect to that Policy or Annuity, except as otherwise provided under the terms of Exhibit A.

a.   To submit a Claim to Claim Evaluation, a Class Member first must have selected Claim Evaluation on the Election Form included in the Class Notice Package and returned the Election Form so that it is received by the date stated on the Election Form, which date shall be at least 30 days before the Fairness Hearing, except as provided in Exhibit A.

32

b.      Beginning on the Implementation Date, the Company shall mail a
Post-Settlement Mailing, including a Claim Form, to each Class Member who selected Claim
Evaluation in a timely returned Election Form.

(1)     The Claim Form sent to each such Class Member shall
advise the Class Member that he or she shall have 60 days from the Company's mailing of the
Claim Form to submit a Claim by completing and returning the Claim Form.  The Claim Form
shall also advise the Class Member that he or she may choose not to submit a Claim Form, and
that if he or she does not timely submit a Claim Form, he or she will no longer be eligible for
Claim Evaluation, but instead will automatically receive the General Relief for which he or she
would have been eligible had he or she not elected Claim Evaluation on the Election Form.

(2)     Each Claim submitted to Claim Evaluation must include a
Claim Form completed to the best of the Claimant's ability, copies of all documents in the
Claimant's possession relating to the Policy or Annuity that is the subject of the Claim, and any
affidavits or other materials the Claimant wishes to submit.  Claimants shall retain the right to
supplement their Claim Forms at any time before final resolution of their Claims.

(3)     A Claimant's failure, without reasonable justification, to
provide a completed Claim Form and all relevant documents in his or her possession may result
in a default or adverse relief determination under Claim Evaluation.

c.      A Class Member who, for good cause, is unable to return his or her
Election Form or Claim Form in a timely manner may present the reason for the delay to the
Claim Evaluator and request additional time to make the election or file the Claim Form.  If a
Class Member seeks an extension of time to file an Election Form or a Claim Form, the Claim

33

Evaluator shall determine if an extension shall be granted, whether based on hardship or any other reason.

      2.    The Company's Gathering of Certain Information

      a.    The Company shall designate a Company Liaison(s) to serve at the Company's expense as a customer resource liaison to reasonably and promptly respond to requests by the Claim Evaluator for information and other assistance reasonably necessary or appropriate for the Company to provide in fulfilling its obligations stated in this Agreement with respect to the evaluation, determination and resolution of Claims submitted to Claim Evaluation.

      b.    Nothing contained in this Agreement or in Exhibit A hereto shall be construed to require the Claim Evaluator to obtain any information that is not contained in the Customer File or to undertake any analysis or perform any services beyond those which the Claim Evaluator deems necessary, in his or her discretion, to implement the provisions of Exhibit A.

      c.    Upon receipt of a Claim Form from a Class Member, the Administrator shall provide the Company with a copy of the Claim Form and copies of all documents submitted by the Class Member.

      d.    The Company shall use its best efforts to assemble the Customer File and to provide a Claim File to the Claim Evaluator within 60 days, but in no event more than 150 days, after the Company's receipt of a Claim Form. The Claim Evaluator shall keep all information received from the Company confidential.

      e.    All such information, and all other information provided to Plaintiffs, to Co-Lead Counsel, to any individual Class Member or counsel for any Class



Member, or to the Claim Evaluator regarding the Company's Policy and Annuity owners, Class

Members, and present or former employees or representatives, as well as any procedures of the

Company disclosed to any of the foregoing in connection with implementing the terms of this

Agreement, constitute trade secrets and highly confidential and proprietary business information

which shall be deemed "Confidential" pursuant to the Case Management Orders and protective

orders that have been and shall be entered in the Action, and shall be subject to all of the

provisions thereof.

      C.    Claim Evaluation

      1.    Based solely upon his or her review of the Claim File and in accordance

with Exhibit A, the Claim Evaluator shall determine the Claim Category or Categories applicable

to the Claim, and refer the Claim to the appropriate Claim Evaluation process for resolution.

      2.    Any decision by the Claim Evaluator regarding the categorization of a

Claim shall be final and binding, subject to the provisions of the attached Exhibit A.

      3.    In no event shall more than one form of relief be awarded for a single

Policy or Annuity, nor shall there be any duplicative relief for a single Policy or Annuity.

**VII.    THE CLAIM REVIEW PROCESS**

      A.    Review of the Claim

      1.    For each Claim that the Claim Evaluator has categorized and referred to

the Claim Review Process, the Claim Evaluator shall determine, based upon his or her review of

the Claim File and in accordance with Exhibit A, (*i*) the Claim Designation or Designations

applicable to the Claim in each applicable Claim Category, and (*ii*) the relief for the Claim, if

any, that takes into account, among other things, the nature and strength of the Claim and the damages incurred because of the alleged misrepresentation(s) or other alleged wrongdoing.

    2.     The Claim Evaluator shall use his or her reasonable best efforts (a) to complete review of each Claim within 150 days of receipt of the Claim File, and (b) to complete the Claim Review Process within 180 days of receipt of the last Claim File.

    3.     Any final scoring of Claims and/or award of relief in the Claim Review Process by the Claim Evaluator shall be final and binding, subject to the provisions of Exhibit A. Except as provided in Exhibit A hereto, the Company, the Claimant, Class Members, Co-Lead Counsel, Defendants' Counsel, the successors or assigns of any of the foregoing, and any other party in interest, are prohibited from seeking review or in any other way challenging in any forum whatsoever, including in a judicial proceeding or an arbitration, a decision or award of relief, if any, pursuant to the foregoing provisions and the attached Exhibit A.

    B.    Distribution of Relief Awarded in the Claim Review Process

    1.     The relief available in the Claim Review Process consists of the CRP Total Fund, which has an aggregate value to Class Members of $690 million. The CRP Total Fund is comprised of: (1) the CRP Cash/Credit Relief Fund, which is a $300 million fund payable as Policy or Annuity adjustments or, in certain circumstances, in cash payments, and (2) the CRP Death Benefit Relief Fund, which will provide death benefits with an aggregate value to Class Members of $390 million, based on comparable insurance rates in the open market.

    2.     After the Claim Evaluator has scored all Claims received in the Claim Review Process, he or she shall make a preliminary determination of the appropriate relief for

36

those Claims pursuant to the procedures described in Exhibit A.  If, based on the Claim Evaluator's determinations, the aggregate preliminary awards from the CRP Cash/Credit Relief Fund would exceed the CRP Cash/Credit Relief Fund, together with any remaining interest accrued thereon in accordance with sections X.A and VII.C, then the Claim Evaluator shall reduce all final awards from the CRP Cash/Credit Relief Fund pursuant to the formula described in section II.D.7 of Exhibit A and substitute death benefits from the CRP Death Benefit Relief Fund, to the extent available, in accordance with section II.D.7 of Exhibit A.

   3.  If, based on the Claim Evaluator's determinations, the aggregate preliminary awards of death benefits would exceed the CRP Death Benefit Relief Fund, then the Claim Evaluator shall reduce all final awards from the CRP Death Benefit Relief Fund pursuant to the formula described in section II.D.8 of Exhibit A and substitute cash/credit relief benefits from the CRP Cash/Credit Relief Fund, to the extent available, in accordance with section II.D.8 of Exhibit A.

   4.  If, based on the Claim Evaluator's scoring of all the Claims received in the Claim Review Process, the preliminary awards from the CRP Cash/Credit Relief Fund and the CRP Death Benefit Fund would exceed the CRP Total Fund, together with any remaining interest accrued on the CRP Cash/Credit Relief Fund in accordance with sections X.A and VII.C, then the Claim Evaluator shall reduce all final awards from the CRP Cash/Credit Relief Fund and the CRP Death Benefit Fund pursuant to section II.D.9 of Exhibit A; provided, however, that if the total relief to be awarded by the Claim Evaluator to all Claimants in the Claim Review Process would exceed the CRP Total Fund, together with any remaining interest accrued on the CRP Cash/Credit Relief Fund in accordance with sections X.A and VII.C, and the relief

37

attributable to Savings and Retirement Claims exceeds $10 million, based on the cost to the

Company, then the Company shall contribute to the CRP Cash/Credit Relief Fund the amount, if

any, by which the total relief to be awarded by the Claim Evaluator for all Savings and Retire-

ment Claims exceeds $10 million, subject to the provisions of the attached Exhibit A.

        5.     If the value of the Aggregate CRP Relief is less than the CRP Total Fund,

together with any remaining interest added to the CRP Cash/Credit Relief Fund, Class Members

shall receive an "enhancement" pursuant to section II.D.11 of Exhibit A.

        C.    <u>Payment of the Claim Evaluator's Fees and Expenses</u>

        1.     The total fees and expenses of the Claim Evaluator shall be paid from the

interest accrued on the CRP Cash/Credit Relief Fund. The Claim Evaluator shall receive $21

million in compensation for total fees and any expenses not paid by the Company; provided,

however, that if the number of Class Members who submit completed Claim Forms to the Claim

Evaluator is no greater than four percent of the Class, then the Claim Evaluator shall receive no

more than $19 million in compensation for total fees and expenses, and that if the number of

Class Members who submit completed Claim Forms to the Claim Evaluator is no greater than

three percent of the Class, then the Claim Evaluator shall receive no more than $17 million in

compensation for total fees and expenses.

        2.     If the Claim Evaluator's fees and expenses exceed the interest accrued on

the CRP Cash/Credit Relief Fund, then the balance of his or her fees and expenses shall be paid

from the CRP Cash/Credit Relief Fund if, after the preliminary determination of the Aggregate

CRP Relief and before any final awards or any spillover enhancement as provided in section

VII.B.5 of this Agreement, the balance of the CRP Cash/Credit Relief Fund is sufficient;

38

provided, however, that the Company shall pay the Claim Evaluator's remaining fees and expenses if the amount remaining in the CRP Cash/Credit Relief Fund is insufficient to pay those fees and expenses. If the Claim Evaluator's fees and expenses are less than the interest accrued on the CRP Cash/Credit Relief Fund, the remainder of the interest shall be added to the CRP Cash/Credit Relief Fund.

## VIII.  THE PART VIII ADR PROCESS

A.     As more particularly described in Part VIII of Exhibit A to this Agreement, all Class Members' Claims that are not within the categories of the Claim Review Process and are not subject to the Part IX Arbitration Process shall be reviewed and awarded relief in the Part VIII ADR Process set forth in Exhibit A.

B.     If, as part of the Part VIII ADR Process, the Claimant is dissatisfied with the relief awarded by the Company in accordance with the criteria established in Exhibit A, the Claimant may appeal to a neutral arbitrator as described in Exhibit A.

C.     The arbitrator's decision shall be based exclusively on the criteria established in Exhibit A, and the amount awarded shall be final and not appealable by the parties in any judicial or administrative proceeding, except as provided in Exhibit A.

D.     Any relief awarded in the Part VIII ADR Process shall be paid by the Company separately from and in addition to the CRP Total Fund. The Company also shall pay the fees and expenses of the arbitrator. For any timely Claim brought under Part VIII that is also brought within one year from the Implementation Date, where a Claimant receives an award in the Part VIII ADR Process, the Company shall, if the Claimant was represented by an attorney during the ADR process, pay an additional sum equal to 20% of the relief awarded as compensation for the

39

Claimant's attorneys' fees and expenses, even if the award is made more than one year after the Implementation Date.

## IX.    THE PART IX ARBITRATION PROCESS

A.      As set forth in more detail in Exhibit A, the Part IX Arbitration Process shall be used to resolve any Claim that, at the time the Class Member bought a tax deferred Annuity, the Company allegedly improperly marketed and sold the Annuity for funding a qualified plan under the Internal Revenue Code on the basis of a tax deferral advantage that did not exist, because any investment in a qualified plan already is tax deferred. All such Claims must be brought within 60 days from the date the Claim Form is mailed to the Class Member.

B.      As provided in Exhibit A, the Company shall have 60 days from receipt of a Part IX Claim to make an offer of relief for that Claim. The Company shall pay for a Claimant Representative to be appointed by Co-Lead Counsel for Plaintiffs, who will represent the Claimant in evaluating any offer of relief from the Company and pursuing any Claim through arbitration, as described below and in Exhibit A.

C.      If the Company makes no offer of relief or if the Claimant rejects the Company's offer of relief, the Claimant may appeal to an independent arbitrator selected pursuant to Exhibit A. The arbitrator's decision with respect to the relief to be awarded shall be final and shall not be appealable by the parties in any judicial or administrative proceeding, except as provided in Exhibit A.

D.      Any relief awarded in the Part IX Arbitration Process shall be paid by the Company separately from and in addition to the CRP Total Fund. The Company also shall pay the fees and expenses of the arbitrator.

40

## X.    THE COMPANY'S FUNDING OBLIGATIONS

### A.    Establishing the CRP Cash/Credit Relief Fund

1.    Beginning 10 days after the Execution Date, compound interest shall accrue on the CRP Cash/Credit Relief Fund at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of 6-month United States Treasury bills settled immediately before the Execution Date. The interest that accrues on the CRP Cash/Credit Relief Fund shall be applied to the fees and expenses of the Claim Evaluator relating to Claim Evaluation and/or CRP Administration. Any portion of the accrued interest that is not applied to the fees and expenses identified in this subsection shall be added to the CRP Cash/Credit Relief Fund.

2.    As provided in section VII.C of this Agreement, the Company is responsible for paying any of the Claim Evaluator's remaining fees and expenses after the CRP Cash/Credit Relief Fund and any interest accrued thereon have been exhausted. In no event shall the Company be required to pay the Claim Evaluator more than $21 million, which is the maximum amount the Claim Evaluator may receive as compensation for total fees and expenses not paid by the Company.

### B.    Funding the Relief under Sections IV - VII of this Agreement

No later than the Final Settlement Date, the Company shall reserve funds sufficient to meet its obligations under sections IV - VII of this Agreement.

41

C.     Funding Reverts upon Termination

If this Agreement is terminated for any reason, the right to all remaining funds reserved

by the Company for the benefit of the Class, as well as all funds paid to the Claim Evaluator that

have not been expended for purposes of Claim Evaluation, shall revert to the Company.

## XI.     NOTICE TO THE CLASS AND COMMUNICATIONS WITH CLASS MEMBERS

A.     Introduction

As set forth below, the Company will provide notice of the proposed settlement to Class

Members by first class mail and by publication in specified newspapers and periodicals. After

the Final Settlement Date, the Company will send a Post-Settlement Mailing to all Class

Members who have timely elected Claim Evaluation.

B.     Class Notice Package

Subject to the requirements of the Hearing Order and no later than 60 days before the

Fairness Hearing, the Company shall send a Class Notice Package by first-class mail, postage

prepaid, to the last known address, as reflected by the Company's records, of the current or last

owner(s) of record of affected Policies and Annuities. Where the Company is aware that the

Class Member has pending litigation against the Company relating to any matter proposed to be

released by this Agreement, the Class Notice Package also shall be sent to any legal counsel

known to represent the Class Member. The Company shall pay for the costs associated with

producing and mailing the Class Notice Package.

1.     Class Notice. Each Class Notice Package shall contain a Court-approved

Class Notice. The proposed Class Notice, agreed upon by the Parties, will be substantially in the

42

form included in Exhibit B. The Class Notice shall conform to all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of Court and any other applicable law, and shall otherwise be in the manner and form agreed upon by the Parties and approved by the Court. It shall include the following three topics:

a.    General Terms. The Class Notice shall contain a plain and concise description of the Action, the Class certification and the proposed settlement, including information on who are Class Members and how the proposed settlement would operate to provide relief to individual class members. The Class Notice Package also shall have a foreign-language statement on the envelope substantially in the form included in Exhibit B.

b.    Notice of Exclusion and Objection Rights. The Class Notice shall inform Class Members of the deadlines and procedures for excluding themselves from the Class, objecting to the proposed settlement, or remaining in the Class, as well as the legal effects of exercising each of these options.

c.    Notice of Fees and Expenses. The Class Notice shall provide information about the amounts being sought by Co-Lead Counsel as Attorneys' Fees and Expenses. It also shall explain that the Company will pay the fees and expenses awarded by the Court to Co-Lead Counsel and any Court-approved costs arising from notifying the Class and that such fees and expenses will not be paid out of funds designated for relief to Policy and Annuity owners under this settlement. The Notice shall state that the fees and expenses of the Claim Evaluator shall be paid out of the interest accrued on the CRP Cash/Credit Relief Fund and the remainder, if any, of the Claim Evaluator's fees and expenses not covered by the interest

43

may be paid from the CRP Cash/Credit Relief Fund, pursuant to section VII.C above. The Class Notice also shall explain that, under the settlement, individual Class Members are responsible for any fees and expenses of any counsel they may retain or have retained to represent them individually for any reason, including, but not limited to, counsel retained in connection with the Fairness Hearing or Claim Evaluation, except as provided in the Part VIII ADR Process and Part IX Arbitration Process. In addition, the Class Notice shall explain that Co-Lead Counsel may petition the Court for incentive awards for certain plaintiffs, not to exceed $2,500 per plaintiff, as compensation for the risk and expense they have undertaken on behalf of the Class. It also shall state that such awards, if any, shall be drawn from the CRP Cash/Credit Relief Fund.

    2.    Release. Each Class Notice shall have, as an appendix, a copy of the Release in a form substantially similar to the Release included as part of Exhibit B.

    3.    Fact Sheet. Each Class Notice Package shall include a Fact Sheet in a form substantially similar to the one included as part of Exhibit B.

    4.    Frequently Asked Questions. Each Class Notice package shall include a list of frequently asked questions, together with references to the page numbers of the Class Notice on which the answers may be found. This list shall be substantially similar to the one included as part of Exhibit B.

    5.    Statement of Eligibility. Each Class Notice Package shall include an individual Statement of Eligibility in a form substantially similar to the one included as part of Exhibit B.

    6.    Benefit Voucher. Each Class Notice Package shall include a Benefit Voucher, in a form substantially similar to the one included as part of Exhibit B, that sets forth

44

the estimated amount of the death benefits to which the Class Member may be entitled, as well as the terms of those benefits.

7.      Election Form.  Each Class Notice Package shall include an Election Form for each Policy and Annuity in which the Class Member has or had an ownership interest.  The Election Form shall state clearly that Class Members who forego General Relief in favor of Claim Evaluation bear the risk that they may be awarded no relief at all in Claim Evaluation. The Election Form, as agreed upon by the Parties, will be in a form substantially similar to the one included as part of Exhibit B.

8.      Designation Form.  Each Class Notice Package shall include a Designation Form for each Policy and Annuity in which the Class Member has or had an ownership interest. The Designation Form, as agreed upon by the Parties, will be in a form substantially similar to the one included as part of Exhibit B.

9.      Remailing and Additional Notice.  The Company shall, at its cost, (i) remail any Class Notice Package returned by the Postal Service with a forwarding address that is received by the Company, (ii) attempt to find an address for any returned Class Notice Package that does not include a forwarding address, or retain an address research firm for this purpose, and (iii) if an address research firm is retained, provide a copy of any returned notice to the address research firm as soon as practicable following receipt; provided, however, that the Company shall not be obligated to duplicate the efforts of an address research firm that under-took a search for the Class Member's address prior to the initial mailing.  The Hearing Order shall provide that (a) any retained address research firm shall provide to the Company in

45

connection with each returned notice, as soon as is practicable, either an updated address or a statement that, following due research, it has been unable to obtain an updated address, and (b) the Company shall remail the notice to any Class Member for whom the address research firm provides an updated address.

### C.    Publication Notice

No later than 60 days before the Fairness Hearing, the Company shall publish the Publication Notice, in a form substantially similar to that attached as Exhibit C, once in the national editions of *The New York Times* and *The Wall Street Journal*, in *USA Today*, in *The Pittsburgh Post-Gazette*, in the newspaper with the highest circulation in each of the 50 states, the District of Columbia and San Juan, Puerto Rico, and in such other publications as the Company and Co-Lead Counsel may mutually agree.  The Company shall pay the costs associated with the Publication Notice.  No later than 60 days before the Fairness Hearing, the Company and both of Co-Lead Counsel for Plaintiffs each shall, at its own expense, place the Publication Notice on its Internet website:  http://www.metlife.com, http://www.milberg.com and http://www.ssem.com.

### D.    Post-Settlement Mailing

Beginning on the Implementation Date, the Company shall, at its cost, send a Post-Settlement Mailing to each Class Member who has timely elected Claim Evaluation.

1.    The Post-Settlement Mailing shall instruct that if Class Members wish to submit a Claim, they must complete the enclosed Claim Form and return it to the specified address, so that it is postmarked no later than 60 days after the date on which the Claim Form was mailed to the claimant.

46

2.      The Post-Settlement Mailing shall state that, for each Claim, the Claimant

must submit (a) copies of all documents related to the sale of the Policy or Annuity, (b) copies of

all documents in the Claimant's possession relating to his or her Policy, Annuity or Claim, (c) the

Claim Form, and (d) any other affidavits, documents or materials the Claimant wishes to submit.

3.      The Post-Settlement Mailing shall further state that a Claimant's failure,

absent reasonable justification, to provide a completed, signed and sworn Claim Form and all

relevant documents may result in default or an adverse result under Claim Evaluation.

4.      In addition, the Post-Settlement Mailing shall state that Class Members

may choose not to submit a Claim Form and that, if they do not timely submit a Claim Form,

they will automatically receive the General Relief for which they would have been eligible had

they not elected Claim Evaluation in the Election Form, but they will no longer be eligible for

Claim Evaluation.

E.      Retention of Administrator

Upon consultation and approval of Co-Lead Counsel, the Company shall, at its cost,

retain one or more Administrators to help implement the terms of the proposed settlement.

1.      The Administrator(s) may assist with various administrative tasks,

including, without limitation, (a) mailing or arranging for the mailing of the Class Notice to

Class Members, (b) arranging for publication of the Publication Notice, (c) handling returned

mail not delivered to Class Members, (d) attempting to obtain, where necessary, updated address

information for any Class Notices, (e) making any additional mailings required under the terms

of this Agreement, (f) arranging for and staffing a toll-free telephone number to provide pre-

approved answers to questions from Class Members about the proposed settlement, (g) answer-

47

ing written inquiries from Class Members and/or forwarding such inquiries to Co-Lead Counsel or their designee, (h) receiving and maintaining on behalf of the Court any Class Member correspondence regarding requests for exclusion from the settlement, (i) handling Election Forms and Designation Forms returned by Class Members in response to the Class Notice, (j) mailing or arranging for the mailing of the Post-Settlement Mailing to Class Members who have timely elected Claim Evaluation, (k) formulating and maintaining a database of all responses from Class Members, and (l) otherwise assisting the Company with administration of the settlement. The Company shall pay the reasonable fees and expenses of the Administrator(s), as well as any other fees and expenses incurred in performing all of the tasks described in this section. Co-Lead Counsel and/or their designee shall be entitled to observe and monitor the performance of the Administrator.

      2.     The contract between the Company and the Administrator shall obligate the Administrator to abide by the following performance standards:

      a.     The Administrator shall accurately and neutrally describe, and shall train and instruct its employees and agents to accurately and neutrally describe, the provisions of this Agreement in communications with Class Members;

      b.     The Administrator shall provide prompt, accurate and neutral responses to inquiries from Co-Lead Counsel for Plaintiffs or their designee, Defendants and/or Defendants' Counsel.

      c.     If, in the course of any communication with a Class Member, the Class Member requests that the Administrator and/or its agent or employee refer the communica-

48

tion to the Company or Co-Lead Counsel, then the Administrator and/or its agent or employee shall promptly fulfill such request.

        d.     If, in the course of any communication with a Class Member, an agent or employee of the Administrator reasonably concludes that the Class Member is not satisfied with the information and/or assistance provided, then the agent or employee shall promptly refer the Class Member's communication to a supervisor on duty, a representative of the Company and Co-Lead Counsel or their designee.

        3.     If the Administrator makes a material misrepresentation to, or fraudulently conceals requested material information from, Co-Lead Counsel or Defendants' Counsel, then the Party to whom the misrepresentation is made (or, in the case of a concealment, the requestor of the information) shall have the right to demand that the Administrator immediately be replaced. If the Administrator fails to perform adequately on behalf of the Company and the Class, the Parties can agree to remove or replace the Administrator. All disputes regarding the retention or dismissal of the Administrator shall be resolved by the Court.

        F.     <u>Toll-Free Telephone Number for Settlement Information</u>

        Subject to the provisions of section E above, the Administrator shall establish a telephone bank with a toll-free telephone number for the sole purpose of responding to inquiries about the Action or the proposed settlement. The Administrator shall direct all callers with general product questions, product status requests, or complaints unrelated to the settlement or the Action to call the Company's toll-free number.

        1.     The Administrator shall be responsible for (a) staffing the telephone bank with telephone representatives, (b) educating the telephone representatives about the background

49

of the Action, the product concepts relevant to the proposed settlement, and the terms and chronology of the proposed settlement, (c) training the telephone representatives to answer inquiries, (d) providing scripts and model questions and answers (prepared by the Company and approved by Co-Lead Counsel) for the telephone representatives to use in answering inquiries, (e) training the telephone representatives to refer Class Member inquiries to Co-Lead Counsel or their designee if the Class Member so requests or where otherwise appropriate, including under the circumstances described in section XI.E.2.c, (f) training telephone representatives to refer callers with general product questions, product status requests, or complaints unrelated to the settlement or this Action to call the Company's toll-free customer service number, (g) providing for a translation service for non-English speaking Class Members who call the toll-free number for information regarding the settlement, (h) providing callers access to a terminal for the hearing-impaired, and (i) taking any other steps, in consultation with the Company and Co-Lead Counsel, to promote accurate and efficient communications with Class Members, Claimants and other policy and annuity owners.

       2.     Co-Lead Counsel or their designees may monitor and participate in the education and training process for telephone representatives in the following manner:

       a.     All training and other communications between the Parties and telephone representatives and/or supervisors must be agreed upon by the Parties. Co-Lead Counsel or their designee may observe any communications involving either the Administrator or the Company (or their designee) and the telephone representatives and supervisors of telephone representatives, including any training and instruction. Co-Lead Counsel or their designee may participate in all training sessions, speak with telephone representatives and

50

supervisors, and provide additional comment and/or instruction to telephone representatives and/or supervisors as they deem necessary. The Company may observe any communications between Co-Lead Counsel or their designee and the telephone representatives and supervisors. Either Party may request and obtain a pause in any training session or other communication with a telephone representative or supervisor to confer regarding the content of the communication or training.

b.      The Company and Co-Lead Counsel or their designees shall agree on all telephone scripts to be used by the telephone representatives, and all training materials and presentations, whether written or oral, provided to telephone representatives. The Company shall provide Co-Lead Counsel with complete drafts of all telephone scripts, written materials or written presentations at least 7 days prior to their use in training. Co-Lead Counsel shall respond to the Company with comments within 2 days of the intended use of such documents. Any proposed changes, modifications or additions to the telephone scripts or written training materials by either party must be provided to the other party with sufficient time to permit meaningful comment prior to use. The Parties shall negotiate in good faith concerning any such changes, modifications or additions to facilitate providing clear, understandable and accurate information to Class Members.

c.      In addition, Co-Lead Counsel may provide an on-site presence at the telephone bank to monitor telephone representatives' handling of Class Members' telephone inquiries and also to speak directly with any Class Member who requests to speak to Co-Lead Counsel. Each representative of Co-Lead Counsel who provides such presence shall be fully

51

informed about the terms of this settlement and all other pertinent matters, including the background of this Action.

        d.     If, during a Class Member's telephone call to the toll-free number, the telephone representative deviates from the approved script and the monitoring Co-Lead Counsel or their designee believes that such deviation was inaccurate, confusing or misleading, Co-Lead Counsel or their designee may contact the Class Member to address the inaccuracy.

        G.     <u>Right of Communication with Claimants and Company Customers</u>

        1.     Subject only to the following conditions, the Parties agree that the Company retains its right to communicate with and respond to inquiries from present and former Company customers, including policy and annuity owners and Class Members, orally and/or in writing, and it may do so through any appropriate Producers or others as described below.

        2.     The Company's Producers retain the right to respond to inquiries from, and/or communicate with, present or former Company customers, including Class Members. However, the Company shall (i) instruct its current Producers to refer Class Member inquiries about the settlement to the toll-free number established to respond to such inquiries, and (ii) instruct its current Producers that, during the period from the Execution Date through the conclusion of Claim Evaluation, they may not take original documents and/or records from Class Members. Co-Lead Counsel may review and comment on advance copies of written communications with Producers about the proposed settlement, and may observe live, taped or broadcast presentations or special training programs directed at the Producers, if any, on the proposed settlement. Co-Lead Counsel shall not be allowed to participate in such training or control the content thereof.

52

3.       During the period following the Execution Date and prior to election of settlement relief by individual Class Members, the Company will continue to process and respond to customer complaints, notwithstanding the fact that certain complaints may originate with Class Members and may concern claims that otherwise could be eligible for relief under Claim Evaluation; provided, however, that, after the date on which preliminary approval of this Agreement is granted by the Court, any Company offer of relief in response to a Class Member's complaint shall be accompanied by a statement, substantially in the form of the attached Exhibit H, advising the Class Member of the proposed settlement and explaining to the Class Member that any relief received by a Class Member prior to election of settlement relief may be offset against any award of relief granted under Claim Evaluation.  Participation in any governmental, administrative or regulatory enforcement proceeding will not affect a person's eligibility to be a Class Member.

4.       Mass and/or generalized communications specifically about the proposed settlement directed to all Class Members or a group thereof – whether made by Co-Lead Counsel, the Company, the Administrator or the Claim Evaluator, and whether by mail, the establishment or encouragement of Internet websites or other Internet communications, tele-phone scripts, or any other means – shall be made jointly with, or with the approval of, the other Party.

H.       Media Communications

The form and content of the initial joint written statement, press release or other media notice to be issued in connection with the proposed settlement on or after the Execution Date shall be mutually agreed upon by the Parties.  Any subsequent formal written statements, written

53

press releases or other written media notices to be issued in connection with the proposed settlement shall be exchanged by the Parties sufficiently in advance of public release to provide the other Party with adequate time to prepare its own statement. Co-Lead Counsel and the Company shall ensure that any comments about or descriptions of the proposed settlement or its value or cost in the media or in any other public forum are balanced, fair and accurate.

I.     The Company's Dealings with Producers

The Company is committed to treating its Producers fairly and will not retaliate or otherwise take adverse action against any Producer solely because of the Producer's cooperation or participation in Claim Evaluation pursuant to this Agreement or the disposition of claims submitted in Claim Evaluation. Plaintiffs recognize, however, that the Company has the right and regulatory obligation to train, monitor, supervise and, where necessary, discipline its Producers and to take any remedial or other steps it deems appropriate to protect past, present and future policy owners and annuity owners and the Company. In taking such steps, the Company may take account of all relevant facts and circumstances of an individual case, including any facts and circumstances discovered during Claim Evaluation. This subsection does not create any rights enforceable by Class Members or third parties, including Producers, under this Agreement.

J.     Co-Lead Counsel's Communications with Producers

1.     Where necessary, Co-Lead Counsel may contact a Producer who is currently employed by or under contract with the Company and who sold or serviced a Policy or Annuity that is the subject of a Claim, and the Company shall cooperate in providing the

54

Producer's current address and telephone number; provided, however, that any contact by Co-Lead Counsel with any such Producer shall be made jointly with the Company.

2.      Where necessary, Co-Lead Counsel may contact a Producer who is no longer employed by or under contract with the Company but who sold or serviced a Policy or Annuity that is the subject of a Claim. Where available, the Company will provide Co-Lead Counsel with the Producer's last known address and telephone number; provided, however, that any contact by Co-Lead Counsel with any such Producer shall be made jointly with the Company.

K.      Co-Lead Counsel's Administrative Responsibilities

1.      Co-Lead Counsel shall be responsible for (a) retention of the Claim Evaluator and (b) upon receipt of the Claim Files by the Claim Evaluator, the implementation and conduct of the administration of the Claim Review Process. If it becomes necessary to replace the Claim Evaluator because of death, disability or otherwise, Co-Lead Counsel shall be responsible for the retention of the replacement Claim Evaluator.

2.      In completing the administrative tasks associated with the CRP Administration, Co-Lead Counsel may, but are not required to, use the services of the Administrator, provided that any such use shall be deemed to be included within CRP Administration. Co-Lead Counsel shall fully cooperate with any reasonable requests for information or assistance made by the Administrator in the regular course of performing its duties.

3.      The Company and Co-Lead Counsel shall have reasonable access to files and/or other materials gathered, generated or utilized by the Claim Evaluator in Claim Evaluation, not including privileged files or attorney work product; provided, however, that any such

55

request shall: (a) be fulfilled at the expense of the party requesting such access, and (b) not unduly disrupt the Claim Evaluator's administration of Claim Evaluation or the Claim Review Process.

      4.     The Parties agree that Claim Evaluation shall be used as a forum for the fair resolution of Claims and not the slander or defamation of the character or reputation of the Company, its present or former employees, Producers, or representatives, Co-Lead Counsel for Plaintiffs, Defendants' Counsel, or the Parties herein.

      5.     The form and content of the letter notifying Claimants of the relief, if any, awarded in Claim Evaluation shall be substantially as appears as part of Exhibit J.

      6.     At the conclusion of the Claim Review Process, when all CRP relief has been determined, Co-Lead Counsel and/or the Claim Evaluator shall provide the Company with information indicating the Claim Categorization, Claim Designation and the amount of relief, if any, to be awarded on each Claim by Policy or Annuity identification number. In addition, during the Claim Review Process, the Claim Evaluator shall upon request, but in no event more frequently than every 60 days, provide the Company and Co-Lead Counsel with information concerning the status of the claims to be evaluated.

## XII.   REQUESTS FOR EXCLUSION

      A.     Any potential Class Member who wishes to be excluded from the Class must mail a written request for exclusion to the Administrator, care of the address provided in the Class Notice, so that it is received no later than 30 days before the Fairness Hearing, or as the Court otherwise may direct, and specifying the Policy (or Policies) or Annuity (or Annuities) that he or

she wants to exclude. A list reflecting all requests for exclusion shall be filed with the Court by the Company at or before the Fairness Hearing.

B.      Any potential Class Member who is not excluded by the filing of a timely written request for exclusion with respect to a Policy or Annuity as provided in the preceding subsection shall be bound with respect to that Policy or Annuity by all subsequent proceedings, orders and judgments in this Action, even if he or she has pending, or subsequently initiates, litigation, arbitration or any other proceeding against the Company relating to that Policy or Annuity and the claims released in this Action.

## XIII.   OBJECTIONS TO SETTLEMENT

A.      Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness or adequacy of this Agreement or the proposed settlement, to the certification of the class, to the award of Attorneys' Fees and Expenses, or to any requests for incentive awards to certain plaintiffs, must deliver to Co-Lead Counsel and Defendants' Counsel and file with the Court, no later than 30 days before the Fairness Hearing or as the Court otherwise may direct, a statement of his or her objection, as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of the objection. Class Members may so object either on their own or through an attorney hired at their own expense.

B.      Class Members and their personal attorneys may obtain access, at their own expense, to review the documents the Defendants produced to Co-Lead Counsel during the course of discovery in this Action, and also to review the deposition transcripts (and exhibits

57

thereto) generated in this Action, provided, however, that they first agree in writing to be bound by the Confidentiality Agreement attached as Exhibit F, as well as all Case Management Orders and Protective Orders entered and to be entered in this Action. These discovery documents shall be made available only by appointment during regular business hours at the offices of Co-Lead Counsel at Specter Specter Evans & Manogue, P.C., Koppers Building, 26th Floor, Pittsburgh, Pennsylvania. Co-Lead Counsel shall inform Defendants' Counsel promptly of any requests by Class Members or their attorneys or other persons or entities for access to such documents.

C.     If a Class Member hires an attorney to represent him or her, the attorney must (1) file a notice of appearance with the Clerk of Court no later than 30 days before the Fairness Hearing, or as the Court otherwise may direct, and (2) deliver to Co-Lead Counsel and Defendants' Counsel no later than 30 days before the Fairness Hearing a copy of the same.

D.     Any Class Member who files and serves a written objection, as described in section XIII, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's own expense, to object to the fairness, reasonableness or adequacy of this Agreement or the proposed settlement, to the award of Attorneys' Fees and Expenses, or to any request for incentive awards for certain plaintiffs. Class Members or their attorneys intending to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to Co-Lead Counsel and Defendants' Counsel and file it with the Court no later than 30 days before the Fairness Hearing, or as the Court otherwise may direct.

E.     Any Class Member who fails to comply with the provisions of this section shall waive and forfeit any and all rights he or she may have to appear separately, object, and/or

appeal, and shall be bound by all the terms of this Agreement and by all proceedings, orders and judgments in this Action.

## XIV.  RELEASE AND WAIVER AND ORDER OF DISMISSAL

### A.    Release and Waiver

Plaintiffs and the Class agree to the following release and waiver, which shall take effect upon entry of the Final Order and Judgment:

1.      Plaintiffs and all Class Members hereby expressly agree that they shall release and discharge the Releasees from any and all claims or causes of action -- known or unknown -- that were or could have been asserted in this Action with respect to Policies, and with respect to Annuities solely as described below in subsections (b), (d) and (e).  As part of this Release, Plaintiffs and all Class Members agree that they release, acquit and forever discharge all Releasees from and shall not now or hereafter institute, participate in, maintain, maintain a right to or assert against the Releasees, either directly or indirectly, on their own behalf, derivatively, or on behalf of the Class or of any other person or entity, any and all causes of action, claims, damages, awards, equitable, legal and administrative relief, interest, demands or rights, including, without limitation, claims for rescission, restitution or all damages of any kind, including those in excess of actual damages, and claims for mental anguish, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by Plaintiffs or any Class Member against the Releasees or any of them in this Action or in any other court action or before any administrative body (including any brought by or on behalf of any state attorney general or Department of Insurance or other regulatory entity or federal, state or local

59

prosecutorial or other organization), tribunal, arbitration panel, or other adjudicatory body on the basis of, connected with, arising out of, or related to, in whole or in part, the Policies, the Annuities (solely to the extent described below in subsections (b), (d) and (e)), and the Released Transactions, including, without limitation:

a.      any or all of the acts, omissions, nondisclosures, facts, matters, transactions, occurrences, or oral or written statements or representations that have been, could have been, may be or could be directly or indirectly alleged, asserted, described, set forth or referred to in the Complaint, Amended Complaint, or the Action;

b.      any or all of the acts, omissions, nondisclosures, facts, matters, transactions, occurrences, or oral or written statements or representations allegedly made in connection with or directly or indirectly relating to the Released Transactions (to the extent applicable to Policies and/or Annuities), including, without limitation, any acts, omissions, nondisclosures, facts, matters, transactions, occurrences, or oral or written statements or representations relating to:

1.      the number of out-of-pocket payments that were paid or would need to be paid for a Policy or Policies, or in connection with a Vanishing Premium scheme, as alleged in the Action, or the accelerated payment plan or accelerated payment arrangement;

2.      the ability to keep or not to keep a Policy or Policies in force based on a fixed number and/or amount of premium payments (less than the number and/or amount of payments required by the terms of the Policies), and/or the amount that would be realized or paid under the Policies based on a fixed number and/or amount of cash payments (less

60

than the number and/or amount of payments required by the terms of the Policies), whether in the form of (i) cash value and/or (ii) death, retirement or periodic payment benefits;

3.      the dividends, interest rates or other policy credits credited or to be credited to premiums paid on a Policy or Policies, or to amounts within a Policy or Policies, and the deductions or charges (including all expense and other deductions or charges) charged or to be charged against the Policy or Policies;

4.      the nature, characteristics, terms, appropriateness, suitability, descriptions and operation of a Policy or Policies, including, without limitation, (i) the amount or method of calculation of fees, charges, commissions, distribution costs, administrative expenses and/or taxes in connection with the sale of, as part of the premiums for, or in connection with a full or partial surrender or termination of a Policy or Policies, (ii) the apportionment of coverage between the base and additional insurance or term-rider components of a Policy or Policies, (iii) the cost or availability of additional insurance or term-rider coverage relative to base-policy coverage, or (iv) the ability or inability to reduce the face amount of the base component of a Policy;

5.      the fact that a Policy or Policies were or were not life insurance or that Plaintiffs' or Class Members' objectives (and/or the purchaser's goals) would be funded by the cash values and/or benefits derived from a life insurance policy or that the product being sold was life insurance was minimized or disguised;

6.      whether a Policy or Policies were, would operate or could function as an Investment Plan;

61

7.   the relationship between a Policy's or Policies' cash surrender value and the cumulative amount of premiums paid;

8.   the fact that a part of the premiums paid would not be credited toward an investment or savings account or the Policy's or Policies' cash or accumulation value, but would be used to offset the Company's commission, sales, administration, tax and/or mortality expenses;

9.   the fact that a loan or withdrawal of funds from a Policy or Annuity to fund another Policy or Annuity could result in interest or other charges;

10.  the rate of return on Policy premiums paid with cash value or cash surrender value;

11.  the rate of return on Annuity premiums paid with cash surrender value;

12.  the relative suitability or appropriateness of a Policy for particular types of purchasers;

13.  the use of an existing Policy's or Annuity's cash value or cash surrender value by means of a surrender, withdrawal/partial surrender or loan to purchase or maintain a new Policy or Annuity;

14.  the replacement or rollover of an existing Policy or Annuity with or into a new Policy or Annuity;

15.  with respect to Policies, the Company's practices regarding dividends, account values, policy loans, interest and other policy crediting and cost of insurance and administrative charges; policy or premium charges and monthly deductions; illustrations of

62

dividends, interest and other policy crediting rates, interest or other policy bonuses, account equity rates, account value calculations, policy loans, policy charges, premium charges, monthly deductions, cost of insurance and administrative charges, cash values or death benefits; payment of any dividends to any parents or affiliates; or any other matters relating to dividends with respect to the Policies, interest or other policy crediting rates, interest or other policy bonuses, account equity rates, account value calculations, policy loans, policy charges, premium charges, monthly deductions or cost of insurance and administrative charges;

        16.    the so-called Deferred Acquisition Cost ("DAC") Tax, including any and all reductions in benefits, cash values or policy values, or increases in costs associated with, the DAC Tax on or before 30 days after the Implementation Date;

        17.    the marketing or sale of deferred annuities for funding qualified plans, such as an Individual Retirement Account ("IRA") or a 401(k), on the basis of a tax-deferral advantage that does not exist, because any investment in a qualified plan is already tax deferred;

        18.    the use of direct recognition of policy loans in the calculation of policy benefits and/or costs;

        19.    with respect to the Released Transactions (to the extent applicable to Policies and/or Annuities), the manner in which the Company hired, trained and supervised any of the Releasees, including but not limited to the Company's present and former Producers, general agents, agents, account representatives, sales representatives, branch managers, brokers, solicitors and representatives, or any of them;

63

20.     disclosures in any local, state or federal regulatory filing by the Company relating to the Released Transactions (to the extent applicable to Policies and/or Annuities);

21.     the sale of Policies as investment, savings or retirement funding vehicles, or any representations, promotions, or advertising regarding such matters;

22.     actual or alleged violations of the "replacement" statutes or regulations under applicable law;

23.     the actual or alleged violation of any applicable law or regulation relating to Policy and/or Annuity sales practices otherwise released herein;

24.     the actual or alleged violation of any federal law, including the RICO statute, relating to Policy and/or Annuity sales practices otherwise released herein; and

25.     the actual or alleged violation of any state law relating to Policy and/or Annuity sales practices otherwise released herein.

c.     any or all acts, omissions, nondisclosures, facts, matters, transactions, occurrences or oral or written statements or representations in connection with or directly or indirectly relating to the allegations set forth in the Complaint, Amended Complaint, or the Action with respect to Policies, except as provided in the proviso to subsection 5 below;

d.     any or all acts, omissions, nondisclosures, facts, matters, transactions, occurrences or oral or written statements or representations in connection with or directly or indirectly relating to the allegations set forth in the Complaint, Amended Complaint, or the Action with respect to Annuities; and/or

64

e.       any and all claims for attorneys' fees, costs or disbursements
incurred by Co-Lead Counsel or any other counsel representing Plaintiffs, Class Members,
and/or any individual Class Member in this Action, or by Plaintiffs or the Class Members in this
Action, or any of them, in connection with or related in any manner to the Action, the settlement
of the Action, the administration of such settlement and/or the Released Transactions except to
the extent otherwise specified in the Settlement Agreement.

2.       Nothing in this Release shall be deemed to alter (a) a Class Member's
contractual rights (except to the extent that such rights are altered or affected by the election and
award of benefits under the Settlement Agreement) to make a claim for contractual benefits that
will become payable in the future pursuant to the express written terms of the Policy or Annuity
issued by the Company; (b) a Class Member's right to assert any claim that independently arises
from acts, facts or circumstances arising after the end of the Class Period; (c) a Class Member's
right to make a claim for theft, or the criminal taking of customer funds, relating to a Policy or
Annuity, or (d) the status of claims released pursuant to the nationwide class action settlement in
Horton v. Metropolitan Life Insurance Company, Civ. No. 93-1849-CIV-T-23A (M.D. Fla.).

3.       Plaintiffs and all Class Members expressly agree that this Release will be,
and may be raised as, a complete defense to and will preclude any action or proceeding encom-
passed by the release of the Releasees.

4.       Plaintiffs and Class Members expressly understand that certain principles
of law, such as Section 1542 of the Civil Code of the State of California, provide that a "general"
release does not extend to claims that a creditor does not know or suspect to exist in his favor at
the time of executing the release and which, if known by him, must have materially affected his

65

settlement with the debtor. To the extent that these principles of law arguably may be applicable – notwithstanding that the parties have chosen New York law to govern this Agreement – Plaintiffs and the Class Members hereby agree that these principles (including Cal. Civ. Code Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein) are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of both the Settlement Agreement and this Release.

5.     In connection with this Release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true with respect to the matters released herein or with respect to their Policies for acts, facts, circumstances or transactions occurring or arising during the Class Period. Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all claims relating thereto, that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to their Policies; provided, however, that nothing in this Release shall prevent a Class Member from submitting a claim in Part VIII of Claim Evaluation based on facts arising out of or relating to the administration or servicing of a Policy after its purchase (not including matters described in subsections XIV.A.1.a - d above), so long as the Class Member did not discover the facts forming the basis of the claim – and could not, with reasonable care, have discovered them – before the deadline set in this Agreement for mailing the Election Form.

66

6.    With respect to the allegations regarding Annuities set forth in the Complaint and Amended Complaint, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover facts presently unknown or unsuspected, in addition to or different from those that they now know or believe to be true with respect to their Annuities for acts, facts, circumstances or transactions occurring or arising during the Class Period. Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all matters, and all claims relating thereto, that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action or proceeding) with respect to the allegations set forth in the Complaint, Amended Complaint and/or the Action regarding Annuities.

7.    Nothing in this Release shall preclude any action to enforce any of the terms of the Settlement Agreement, provided that such action shall be brought in the United States District Court for the Western District of Pennsylvania.

8.    Plaintiffs and the Class Members hereby agree and acknowledge that the provisions of this Release, individually and collectively, constitute an essential and material term of the Settlement Agreement.

9.    This Release is the result of a compromise of a disputed claim and shall never at any time be used as evidence of any admission of liability by the Company.

B.    <u>Order of Dismissal</u>. The Parties shall seek and obtain from the Court a Final Order and Judgment (for which, as a condition of settlement, the time for appeal has expired without any modifications in the Final Order and Judgment) as further described below in section XVII. The Final Order and Judgment shall, among other things, (1) approve this Settlement

67

Agreement as fair, reasonable and adequate, (2) dismiss the Action with prejudice and on the merits, and (3) incorporate the terms of the Release.

## XV.   ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS

A.     Co-Lead Counsel for Plaintiffs agree to make, and the Company agrees not to oppose, an application for an award of Attorneys' Fees and Expenses in the Action not to exceed $120,000,000 in fees and $2,500,000 in expenses, which shall be the sole aggregate compensation for all attorneys representing the Class.

B.     The Company shall pay the Court-awarded amount of Attorneys' Fees and Expenses – whatever it may be – from its own funds, and not from any monies set aside pursuant to this Agreement for compensation of Class Members. Co-Lead Counsel, in their sole discretion, shall allocate and distribute this award of Attorneys' Fees and Expenses among all of the counsel who have acted on behalf of the Class herein.

C.     If the Company elects not to exercise its right to terminate the Agreement under section XVIII below, the Company shall pay to Co-Lead Counsel the entire attorneys' fees and expenses awarded by the Court within 10 days after entry of the Final Order and Judgment. If the Final Order and Judgment is reversed, vacated, modified, and/or remanded for further proceedings or otherwise disposed of in any manner other than one resulting in an affirmance of the Final Order and Judgment (other than on the issue of attorneys' fees), or if the Company or Co-Lead Counsel properly and timely terminates the Settlement Agreement in accordance with section XVIII of this Agreement, then Co-Lead Counsel shall, within 10 days, return to the Company the full amount of Attorneys' Fees and Expenses paid by the Company in connection with the Settlement. If the award of Attorneys' Fees and Expenses is reduced after entry of the

68

Final Order and Judgment, then Co-Lead Counsel shall, within 10 days, return to the Company the amount by which the Attorneys' Fees and Expenses have been reduced. Any return of funds under this subsection shall be increased by compound interest at the rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of 6-month United States Treasury bills settled immediately before the date the Company paid the attorneys' fees and expenses. Co-Lead Counsel's obligation to return any of the Attorneys' Fees and Expenses, as described above, shall be evidenced by a promissory note, which note shall be executed by Melvyn I. Weiss, Esq. on behalf of the firm of Milberg Weiss Bershad Hynes & Lerach LLP and that firm's Executive Committee, and Howard A. Specter, Esq., on behalf of the firm of Specter Specter Evans & Manogue, P.C.

D.     Co-Lead Counsel for Plaintiffs may petition the Court for incentive awards of up to $2,500 per person to be paid to some or all named plaintiffs in the actions being resolved pursuant to this settlement. The purpose of such awards, if any, shall be to compensate the class representatives for efforts and risks taken by them on behalf of the Class. Any incentive awards made by the Court shall be paid solely from the CRP Cash/Credit Relief Fund, and under no circumstances shall the Company be responsible for paying such an incentive award from its own funds.

E.     Neither the Company nor its past, present and future parents (including intermediate and ultimate parents), subsidiaries, affiliates, predecessors, successors and assigns, nor any of their respective past, present and future officers, directors, employees, general agents, agents, branch managers, producers, sales representatives, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them,

69

shall be liable for or obligated to pay any fees, expenses, costs or disbursements to, or incur any expense on behalf of, any person, either directly or indirectly, in connection with this Action, this Settlement Agreement, or the proposed settlement, other than the amount or amounts expressly provided for in this Settlement Agreement.

## XVI.   ORDER OF NOTICE, SETTLEMENT HEARING AND ADMINISTRATION

A.     The Parties have negotiated, drafted and agreed to the content and form of the following documents:  the Guidelines for Determining, Scoring and Awarding Relief in Claim Evaluation (Exhibit A); the Class Notice Package (including the accompanying cover letter, list of frequently asked questions, Notice of Class Action, Proposed Settlement and Fairness Hearing, Release and Waiver, Fact Sheet, Benefit Voucher, Statement of Eligibility, Election Form, Designation Form, and Foreign Language Statement (Exhibit B); the Publication Notice (Exhibit C); the Schedule of Policies Eligible for DAC Tax Relief and DAC Tax Relief Death Benefit Chart (Exhibit D); the Proposed Hearing Order (Exhibit E); the Confidentiality Agreement (Exhibit F); the Proposed Final Order and Judgment (Exhibit G); the Statement to Accompany Post-Execution Date Responses to Customer Complaints (Exhibit H); the Post-Settlement Claim Form Mailing (Exhibit I); Claim Evaluation Administrative Forms and Letters (Exhibit J), and Simplified Underwriting (Exhibit K). These documents are incorporated into, are an integral part of, and are material terms of this Agreement.

B.     No later than August 17, 1999, the Parties shall submit this Agreement, including all attached exhibits, to the Court and seek preliminary approval thereof.  If the Court preliminarily approves the settlement, the Parties shall move the Court to set a Fairness Hearing, and shall proffer the proposed Hearing Order (Exhibit E).

70

C.     No named plaintiff (including Charles V. Amodeo, Dennis W. Biggs, Sr., Joseph P. Garrett, Jr., Ronald R. Hess, Arthur E. Leach, Richard L. Oddi, Harvey J. Williams, and Michael A. Rankin) shall request exclusion from the Class, object to the proposed settlement, or file an appeal from or otherwise seek review of any order approving the proposed settlement.

## XVII. FINAL APPROVAL AND FINAL ORDER AND JUDGMENT

The Parties shall petition the Court for a Final Order and Judgment, substantially in the form attached hereto as Exhibit G.

## XVIII. MODIFICATION OR TERMINATION OF THIS AGREEMENT

A.     The terms and provisions of this Agreement may be amended, modified or expanded only by agreement of the Parties and approval of the Court; provided, however, that after entry of the Final Order and Judgment the Parties may, by written agreement, effect such amendments, modifications or expansions of this Agreement and its implementing documents (including all exhibits hereto) without further notice to the Class or notice to or approval by the Court if such changes are consistent with the Court's Final Order and Judgment and do not limit the rights of Class Members under the Settlement Agreement.

B.     The Company, in consultation with Co-Lead Counsel and without approval of the Court, may implement the terms of the settlement after entry of the Final Order and Judgment but before the Final Settlement Date, in which case all provisions in this Agreement that specify actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date on which the Company elects to implement the Settlement.

71

C.     This Agreement shall terminate at the sole option and discretion of Defendants or Plaintiffs if (1) the Court, or any appellate court(s), rejects, modifies or denies approval of any portion of this Agreement or the proposed settlement that the terminating Party in its (or their) sole judgment and discretion reasonably determine(s) is material, including, without limitation, the terms of relief, the findings of the Court, the provisions relating to notice, the definition of the Class and/or the terms of the Release, or (2) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Final Order and Judgment, or any of the Court's findings of fact or conclusions of law as proposed by Defendants' Counsel and Co-Lead Counsel, that the terminating Party in its (or their) sole judgment and discretion believe(s) is material. The terminating Party must exercise the option to withdraw from and terminate this Agreement, as provided in this subsection, no later than 20 days after receiving notice of the event prompting the termination.

D.     Notwithstanding the preceding subsection, Plaintiffs may not terminate this Agreement solely because of the amount or distribution of Attorneys' Fees and Expenses awarded by the Court or any appellate court(s). The Company, however, may elect to terminate this Agreement if the amount of Attorneys' Fees and Expenses awarded by the Court exceeds the maximum amount agreed upon by the Parties.

E.     The Company also may unilaterally withdraw from and terminate this Agreement within 20 days of receiving notice of either of the following two triggering events:

1.     the number of persons who have elected to exclude themselves from the Class together own more than 1% of all Policies or, alternatively, 1% of all Annuities issued during the Class Period; or

72

2.      any state attorney general or regulatory or administrative authority institutes a proceeding against the Company arising out of or otherwise related to the Released Transactions.

F.      If, based on the number of Class Members initially electing Claim Evaluation during the Class Notice Period, it is expected that more than 5% of Policy owners or 5% of Annuity owners will submit claims to Claim Evaluation, then either the Company or Plaintiffs may argue to the Court that the settlement is unreasonable or unfair.  The Parties further agree that these amounts shall be calculated by reducing the number who initially elect Claim Evaluation by one-third, i.e., based on 7.5% of Claim Evaluation elections during the notice period.

G.      If an option to withdraw from and terminate this Agreement arises under any of the subsections to section XVIII, (1) neither the Company nor Plaintiffs will be required for any reason or under any circumstance to exercise that option, and (2) any exercise of that option shall be made in good faith.

H.      If this Agreement is terminated pursuant to any of the subsections above, then:

1.      This Agreement shall be null and void and shall have no force or effect, and no Party to this Agreement shall be bound by any of its terms, except for the terms of this section XVIII, which include the obligation of Co-Lead Counsel to return any funds paid to them by the Company for Attorneys' Fees and Expenses.

2.      This Agreement, all of its provisions, and all negotiations, statements and proceedings relating to it shall be without prejudice to the rights of the Company, Plaintiffs or

73

any other Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Agreement;

        3.      The Company and its current and former directors, officers, Producers, employees, agents, attorneys and representatives expressly and affirmatively reserve all defenses, arguments and motions as to all claims that have been or might later be asserted in the Action, including, without limitation, any applicable statutes of limitation, statutes of repose, or other prescription period and the argument that the Action may not be litigated as a class action;

        4.      Plaintiffs and their current and former predecessors, successors, heirs, agents or assigns expressly and affirmatively reserve all motions as to, and arguments in support of, all claims that have been or might later be asserted in the Action, including (without limitation) any argument concerning class certification and/or punitive damages;

        5.      Neither this Agreement, nor the fact of its having been made, shall be admissible or entered into evidence for any purpose whatsoever; and

        6.      Any order or judgment entered after the date of this Agreement shall be deemed vacated and will be without any force or effect.

## XIX.  GENERAL MATTERS AND RESERVATIONS

        A.    The obligation of the Parties to conclude the proposed settlement is contingent upon each of the following:

        1.      Acceptance of this Agreement by the Board of Directors of Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, and Metropolitan Tower Life Insurance Company;

2.      The absence of any other policy or annuity owner demands or actions that arise out of or relate to the matters described in the Release and that would materially impair the benefits to the Releasees, or any of them, otherwise provided for by the Release but that would not be terminated or otherwise resolved by this Agreement;

3.      The resolution of any regulatory proceedings arising out of, or relating to the relief to be provided under, the proposed settlement, as described above in subsection XVIII.E.2;

4.      Entry by the Court of the Final Order and Judgment approving the settlement, from which order the time to appeal has expired or which has remained unmodified after any appeal(s).

B.      The Parties and their counsel agree to keep the existence and contents of this Agreement and all related negotiations confidential until the date of the first public announce-ment by the Company; provided, however, that this subsection shall not prevent earlier disclo-sure of such information to regulators, rating agencies, financial analysts, Producers, or any other person or entity (such as experts, courts, and/or Administrators) to whom the Parties agree disclosure must be made to effectuate the terms and conditions of this Agreement.

C.      One year after the Final Settlement Date (unless the time is extended by agree-ment of the Parties), Plaintiffs and their counsel shall return to Defendants' Counsel all docu-ments (and all copies of such documents in whatever form made or maintained) produced by Defendants in this Action, as well as all transcripts of and exhibits to any deposition testimony provided by Defendants or their current or former officers, employees or Producers (and all copies of such documents in whatever form made or maintained); provided, however, that this

75

subsection shall not apply to any documents made part of the record in connection with a Claim made under Claim Evaluation, or to any documents made part of a Court filing, or to Co-Lead Counsel's work product.  Defendants agree to store and preserve all materials returned by Plaintiffs and their counsel pursuant to this subsection for at least one year after the awarding of relief in Claim Evaluation is finally concluded, not including the awarding of relief for any Part VIII Claims.

D.    The Company's execution of this Agreement shall not be construed to release -- and the Company expressly does not intend to release -- any claim the Company may make against any insurer for any cost or expense incurred in connection with this settlement, including attorneys' fees and costs.

E.    Co-Lead Counsel represent that (1) they are authorized by each of the Plaintiffs to enter into this Agreement on behalf of Plaintiffs and any other attorneys who have represented or who now represent Plaintiffs in this Action with respect to the claims in this Action, and (2) they are seeking to protect the interests of the entire Class.

F.    Plaintiffs represent and certify that (1) they have agreed to serve as representatives of the Class proposed to be certified herein; (2) they are willing, able and ready to perform all of the duties and obligations of a representative of the Class, including, but not limited to, being available for, and involved in, discovery and fact finding; (3) they have read the pleadings in this Action, including the Complaint and/or the Amended Complaint, or have had the contents of such pleadings described to them; (4) they are familiar with the results of the fact-finding undertaken by Co-Lead Counsel; (5) they have been kept apprised of settlement negotiations among the Parties, and have either read this Agreement, including the exhibits annexed hereto, or

76

have received a detailed description of it from Co-Lead Counsel, and they have agreed to its terms; (6) they have consulted with Co-Lead Counsel – and/or other plaintiffs' counsel of record – about the Action, this Agreement and the obligations imposed on a representative of the Class; (7) they have authorized Co-Lead Counsel to execute this Agreement on their behalf; and (8) they shall remain and serve as representatives of the Class until the terms of this Agreement are effectuated, this Agreement is terminated in accordance with its terms, or the Court at any time determines that said Plaintiffs cannot represent the Class.

G.    Lawrence A. Vranka represents that he is authorized to enter into this Agreement on behalf of Metropolitan Life Insurance Company, and David A. Levene represents that he is authorized to enter into this Agreement on behalf of Metropolitan Insurance and Annuity Company and Metropolitan Tower Life Insurance Company.

H.    This Agreement, complete with the exhibits attached hereto, sets forth the sole and entire agreement among the Parties with respect to its subject matter, and may not be altered, amended, or modified except by written instrument executed by Co-Lead Counsel and Defendants' Counsel. This Agreement, including its exhibits, supersedes any prior agreement, understanding, or undertaking (written or oral) by and between the Parties regarding the subject matter of this Agreement.

I.    This Agreement and any ancillary agreements shall be governed by and interpreted according to the law of the State of New York, excluding its conflict of laws provisions.

J.    Any action to enforce this Agreement shall be commenced and maintained only in this Court. The Court shall retain jurisdiction over the implementation, administration and conduct of the settlement and the interpretation, construction and enforcement of this Agreement.

77

K.    Whenever this Agreement requires or contemplates that one Party shall or may give notice to the other, notice shall be provided by facsimile and/or next-day (excluding Sunday) express delivery service as follows:

1.    If to Defendants, then to:

Sheila L. Birnbaum, Esq.
Irene A. Sullivan, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

and

Andrew T. Berry, Esq.
B. John Pendleton, Jr., Esq.
McCarter & English, LLP
4 Gateway Center
100 Mulberry Street
Newark, New Jersey 07101
Telephone: (973) 622-4444
Facsimile: (973) 624-7070

and

A. Kaiper Wilson, Esq.
Metropolitan Life Insurance Company
Law Department
One Madison Avenue
New York, New York 10010
Telephone: (212) 578-6107
Facsimile: (212) 578-3916

78

2.      If to Plaintiffs, then to:

Melvyn I. Weiss, Esq.
Brad N. Friedman, Esq.
Milberg Weiss Bershad Hynes & Lerach LLP
One Pennsylvania Plaza
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

and

Howard A. Specter, Esq.
David J. Manogue, Esq.
Specter Specter Evans & Manogue, P.C.
26th Floor, Koppers Building
Pittsburgh, PA 15219
Telephone: (412) 642-2300
Facsimile: (412) 642-2309

L.      All time periods set forth in this Agreement shall be computed in calendar days unless otherwise expressly provided. In computing any period of time prescribed or allowed by this Agreement or by order of court, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days. As used in this subsection, "legal holiday" includes New Year's Day, Birthday of Martin Luther King, Jr., Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day and any other day appointed as a holiday by the President or the Congress of the United States, or by the Commonwealth of Pennsylvania, where the Court is located.

79

M.     The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement.

N.     All Parties agree that this Agreement was drafted by counsel for the Parties during extensive arm's length negotiations. No parol or other evidence shall be offered to explain, construe, contradict or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which the Agreement was made or executed.

O.     In no event shall the Agreement, any of its provisions or any negotiations, statements or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as or deemed to be evidence of any kind in this Action, any other action, or any judicial, administrative, regulatory or other proceeding, except a proceeding to enforce this Agreement. Without limiting the foregoing, neither this Agreement, nor any related negotiations, statements or court proceedings, shall be construed as, offered as, received as, used as or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to Defendants, or as a waiver by Defendants of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, or as a waiver by Plaintiffs or the Class of any claims, causes of action or remedies, including punitive damages.

P.     Defendants expressly deny any wrongdoing alleged in the pleadings and do not admit or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against them in the Complaint, Amended Complaint or the Action, but consider it desirable for the Action to be settled and

80